A. Ross Pearlson
WOLFF & SAMSON PC
One Boland Drive
West Orange, NJ 07052
(973) 325-1500

Matthew W. Friedrich (*pro hac vice* application pending)
Jonathan M. Shaw (*pro hac vice* application pending)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue N.W.
Washington, D.C. 20015
(202) 237-2727

*Counsel for Defendant The Goldman Sachs Group, Inc.*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| SERGEY ALEYNIKOV,<br>Plaintiff,<br>v.<br>THE GOLDMAN SACHS GROUP, INC.,<br>Defendant. | No. 12-cv-5994-KM-MAH<br>**DEFENDANT'S STATEMENT OF MATERIAL FACTS NOT IN DISPUTE** |

Pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 56.1(a), Defendant The Goldman Sachs Group, Inc. ("GS Group") submits the following Statement of Material Facts Not In Dispute in support of its Motion to Dismiss Plaintiff's Verified Complaint Or, In The Alternative, For Summary Judgment.

**DEFENDANT'S STATEMENT OF MATERIAL FACTS NOT IN DISPUTE**

1. The Goldman Sachs Group, Inc. ("GS Group") is a corporation organized under the laws of Delaware. (*See* Affidavit of Matthew E. Tropp, dated October 10, 2012 ("Tropp Aff.") ¶ 3; Affidavit of Gregory K. Palm, dated October 10, 2012 ("Palm Aff.") ¶ 2.)

2. GS Group has adopted the Amended and Restated By-Laws of The Goldman Sachs Group, Inc., dated May 7, 2010 ("By-Laws"). (*See* Palm Aff. ¶ 5.)

3. A true and correct copy of GS Group's By-Laws is set forth in Exhibit 1 to the Declaration of James M. Van Splinter, dated October 11, 2012 ("Van Splinter Decl."). (*See* Van Splinter Decl. ¶ 3.)

4. The Goldman, Sachs & Co. L.L.C. is a limited liability company organized under the laws of Delaware. (*See* Tropp Aff. ¶ 2.)

5. Goldman, Sachs & Co. ("GSCo.") is a limited partnership organized under the laws of the State of New York. (*See* Tropp Aff. ¶ 1; Palm Aff. ¶ 2.)

6. The Goldman, Sachs & Co. L.L.C. is the sole general partner of GSCo. (*See* Tropp Aff. ¶ 2.)

7. GS Group is the sole limited partner of GSCo. (*See* Tropp Aff. ¶ 3.)

8. GSCo. is governed by a Memorandum of Agreement ("Partnership Agreement") between GSCo., as the sole general partner, and GS Group, as the sole limited partner. (*See* Tropp Aff. ¶ 7; Defendant's Statement of Material Facts

Not In Dispute ("Def. Statement") ¶¶ 6–7.)

9. A true and correct copy of the Partnership Agreement is set forth in Exhibit 2 to the Van Splinter Declaration. (*See* Van Splinter Decl. ¶ 4.)

10. GS Group officers are appointed by formal resolution. (*See* Palm Aff. ¶ 3.)

11. GSCo. officers are appointed only when The Goldman, Sachs & Co. L.L.C., acting as the sole general partner of GSCo., adopts a written resolution electing a particular person to hold a particular office of GSCo. (*See* Tropp Aff. ¶ 7.)

12. GSCo. officers are removed from office only when The Goldman, Sachs & Co. L.L.C., acting as the sole general partner of GSCo., adopts a written resolution removing a particular person from the office that he or she held before removal. (*See* Tropp Aff. ¶ 7.)

13. The officers appointed by written resolution consist only of certain discrete members of GSCo.'s senior-most management. (*See* Palm Aff. ¶ 3.)

14. Within GSCo., "vice president" is a functional title simply denoting a relative level of seniority just above associate and below managing director. (Palm Aff. ¶ 4; *see* Affidavit of Caroline Heller, dated October 10, 2012 ("Heller Aff.") ¶ 2.) In order of increasing seniority, such titles are: analyst; associate; vice president; managing director; partner. (*See* Heller Aff. ¶ 3.)

15. There are many thousands of vice presidents, and their equivalents overseas, within GSCo., and approximately two thousand vice presidents, and their equivalents overseas, within the firm's global Securities Division, which includes the Equities Division. (*See* Heller Aff. ¶ 4.)

16. Neither GS Group nor GSCo. considers the individuals holding the functional "vice president" title at GSCo. to be officers of GS Group or GSCo. for any purpose, including as to the advancement and mandatory indemnification provisions of the by-laws of GS Group. (*See* Palm. Aff. ¶¶ 4, 6.)

17. GS Group has never intended to give the individuals holding the functional "vice president" title at GSCo. rights to advancement or mandatory indemnification under the by-laws of GS Group. (*See* Palm Aff. ¶ 6.)

18. Sergey Aleynikov ("Aleynikov") was a mid-level computer programmer employed by GSCo. (*See* Affidavit of Adam Schlesinger, dated October 10, 2012 ("Schlesinger Aff.") ¶ 3; Heller Aff. ¶ 5.)

19. Aleynikov wrote source code and worked mostly on infrastructure-related projects in support of GSCo.'s high-frequency trading operations. Aleynikov was one of approximately 25 such programmers who reported to a managing director. (*See* Schlesinger Aff. ¶¶ 1–3.)

20. At the time he left GSCo., Aleynikov held the functional title of "vice president" in the Equities Division. (*See* Schlesinger Aff. ¶ 2.)

21. No other employees of GSCo. reported to Aleynikov. (*See* Schlesinger Aff. ¶ 4.)

22. Aleynikov did not supervise anyone at GSCo. (*See* Schlesinger Aff. ¶ 4.)

23. Aleynikov did not have any management responsibilities at GSCo. (*See* Schlesinger Aff. ¶ 4.)

24. Aleynikov did not have the authority to transact business on behalf of GSCo. (*See* Schlesinger Aff. ¶ 4.)

25. Aleynikov did not transact business on behalf of GSCo. (*See* Schlesinger Aff. ¶ 4.)

26. Aleynikov did not have the authority to appoint any employees of GSCo. as attorneys-in-fact of GSCo., GS Group, or the firm. (*See* Schlesinger Aff. ¶ 4.)

27. Aleynikov was never appointed as an officer of GSCo. by a written resolution of the general partner. (*See* Tropp Aff. ¶ 9.)

28. Aleynikov was never an officer of GSCo. (*See* Def. Statement at ¶¶ 10–27.)

29. Aleynikov has never served GSCo. in any capacity similar to that of an officer. (*See* Def. Statement ¶¶ 13–26.)

30. Aleynikov was never the manager of GSCo. (*See* Def. Statement

¶¶ 13–26.)

31. Aleynikov has never been an employee of GS Group. (*See* Heller Aff. ¶ 5.)

32. Aleynikov has never been an officer of GS Group. (*See* Tropp Aff. ¶ 6; Def. Statement ¶¶ 16, 26, 31.)

33. GSCo. invests substantial resources in its high-frequency trading business. (*See* Van Splinter Decl. Ex. 3(b), Tr. 339–40, 342–45; Ex. 3(c), Tr. 449–51.)

34. GSCo. strictly guards the confidentiality of its high-frequency trading system and does not sell or license it. (*See* Van Splinter Decl. Ex. 3(f), Tr. 74–75, 89–91; Ex. 3(g), Tr. 288–99; Ex. 3(b), Tr. 346–50; Ex. 3(c), Tr. 478–79; Ex. 3(d), Tr. 694–95.)

35. As part of his employment at GSCo., Aleynikov was bound by confidentiality policies and an agreement requiring him to hold the firm's confidential and proprietary information, including trade secrets, in strict confidence, and to return all such information to the firm at the end of his employment. (*See* Van Splinter Decl. Ex. 3(g), Tr. 288–302.)

36. In April 2009, Aleynikov accepted an employment offer from Teza Technologies ("Teza"), a startup founded in early 2009 with the goal of developing its own high-frequency trading system. (*See* Van Splinter Decl. Ex. 3(h), Tr. 783–

87, 805–06.)

37. Teza was a new company without a high-frequency trading system of its own or source code for such a system. (*See* Van Splinter Decl. Ex. Ex. 3(h), Tr. 790–91, 826.)

38. Aleynikov resigned from GSCo. His last day of work at GSCo. was June 5, 2009. (*See* Van Splinter Decl. Ex. 3(c), Tr. 463.)

39. At approximately 5:20 p.m., just before going to a farewell celebration, Aleynikov encrypted and uploaded more than 500,000 lines of source code for GSCo.'s high-frequency trading system to an outside server in Germany (the "German Server"). (*See* Van Splinter Decl. Ex. 3(i), Tr. 187–206; Ex. 3(j), 221–225; Ex. 3(b), Tr. 365–66; Ex. 3(c), Tr. 463, 606–07; Ex. 3(l), Tr. 630; Ex. 3(k), Tr. 1210–18.)

40. Aleynikov had worked on some of the code he transferred, but also took components that he had not written and had not been directly involved with while at GSCo. (*See* Van Splinter Decl. Ex. 3(c), Tr. 474–95.)

41. Although GSCo. attempts to block access to external servers to which files might be uploaded, at that time, the German Server was associated with a website that was not blocked by GSCo.'s security firewall. (*See* Van Splinter Decl. Ex. 3(f), Tr. 91–92, 167–68.)

42. To facilitate this upload, Aleynikov created a program to combine

thousands of files of source code, which he had selected for copying, into two encrypted computer files. (*See* Van Splinter Decl. Ex. 3(i), Tr. 187–206; Ex. 3(j), Tr. 221–25; Ex. 3(b), Tr. 365–66; Ex. 3(c), Tr. 606–07; Ex. 3(k), Tr. 1210–18.)

43. Aleynikov's transfer of GSCo.'s source code to the German Server was not authorized by GSCo. and was in violation of GSCo. policies. (*See* Van Splinter Decl. Ex. 3(g), Tr. 290–300; Ex. 3(c), Tr. 452–64.)

44. Aleynikov then erased records of this transfer, including records of the commands he used (known as "bash history"), the encryption program, and encryption password. (*See* Van Splinter Decl. Ex. 3(f), Tr. 94–96; Ex. 3(i), Tr. 191–92; Ex. 3(k), Tr. 1213–14.)

45. There is no business reason to delete bash history. In fact, according to Professor Benjamin Goldberg of New York University, who testified in *United States v. Aleynikov* as Aleynikov's expert witness, one reason to delete bash history is "if you don't want people to know what you've done." (*See* Van Splinter Decl. Ex. 3(p), Tr. 1373. *Accord id.* Ex. 3(i), Tr. 194; Ex. 3(j), Tr. 220.)

46. In the evening of June 5, 2009, Aleynikov downloaded the stolen source code from the German Server to his home computer, and then copied some of those files to other devices. (*See* Van Splinter Decl. Ex. 3(m), Tr. 1097; Ex. 3(k), Tr. 1210–17.)

47. Beginning on June 10, 2009, Aleynikov began making changes to the

files he had taken from GSCo. — for example, by deleting information that would reveal the files came from GSCo. — and ultimately provided some of those files to Teza by uploading them to a Teza server. (*See* Van Splinter Decl. Ex. 3(k), Tr. 1233–54.)

48. On July 2, 2009, Aleynikov flew to Chicago, Illinois, to attend meetings at Teza's offices. (*See* Van Splinter Decl. Ex. 3(n), Tr. 886–87.)

49. Aleynikov took with him a flash drive and a laptop computer that each contained proprietary source code taken from GSCo. (*See* Van Splinter Decl. Ex. 3(o), Tr. 1136–37; Ex. 3(k), Tr. 1230–31.)

50. Aleynikov admitted to the FBI that he had uploaded files from GSCo., and that he had selected the German Server because it was not blocked by GSCo.'s security protocols. (*See* Van Splinter Decl. Ex. 3(o), Tr. 1125–27.)

51. Aleynikov acknowledged encrypting the files he uploaded, deleting the encryption software and bash history, and copying the files to his home computer, his laptop, and a thumb drive. (*See* Van Splinter Decl. Ex. 3(o), Tr. 1131–32.).

52. Aleynikov admitted that he erased his bash history because he was concerned about violating GSCo.'s security policies. (*See* Van Splinter Decl. Ex. 3(o), Tr. 1129.)

Dated: October 11, 2012

/s/ A. Ross Pearlson
A. Ross Pearlson
WOLFF & SAMSON PC
One Boland Drive
West Orange, NJ 07052
(973) 325-1500

Matthew W. Friedrich (*pro hac vice* application pending)
Jonathan M. Shaw (*pro hac vice* application pending)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue N.W.
Washington, D.C. 20015
(202) 237-2727

*Counsel for Defendant The Goldman Sachs Group, Inc.*