## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **SERGEY ALEYNIKOV,** | Civ. No. 12-5994 (KM) |
| **Plaintiff,** | |
| **v.** | **OPINION** |
| **THE GOLDMAN SACHS GROUP, INC.,** | |
| **Defendant.** | |

**KEVIN MCNULTY, U.S.D.J.:**

The plaintiff, Sergey Aleynikov, brings this action against Goldman Sachs Group, Inc. ("GS Group"), the parent company of his former employer, Goldman, Sachs & Co. ("GSCo").[1] Aleynikov's complaint seeks (1) indemnification for legal costs and fees arising from his successful defense of federal charges alleging that, while employed as a vice president at GSCo, Mr. Aleynikov stole proprietary computer source code; (2) advancement of legal costs and fees for his defense of state charges arising from the same factual allegations; and (3) advancement of attorneys' fees and expenses incurred in this civil action seeking indemnification and advancement ("fees on fees").[2] Mr. Aleynikov contends that indemnification and advancement are authorized by Section 145 of the Delaware General Corporation Law ("DGCL"), Del. Code Ann. tit. 8, and that they are mandated by Section 6.4 of GS Group's By-laws (the "By-laws"). Section 6.4 of the By-laws, he says, provides for mandatory indemnification and advancement of legal fees and costs incurred by a person

---

[1] Defendant renders this abbreviation as "GSCo.". For typographical reasons, the Court will omit the period.

[2] The Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because complete diversity exists between the parties and the amount in controversy exceeds $75,000. Plaintiff alleges that the District of New Jersey is the appropriate venue for this matter pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claim—including Aleynikov's arrest, his residence while employed by GSCo, and the attorney-client relationship—occurred in the State of New Jersey. *See* Plaintiff's Complaint, Sep. 25, 2012, ECF No. 1 ("Compl.") ¶ 13.

who faces criminal charges by reason of the fact that he was an "officer" of a GS Group subsidiary.

Aleynikov moves for a preliminary injunction compelling GS Group to indemnify him for legal costs already incurred in a federal case and especially to advance his legal fees for the defense of newly-filed state charges. Aleynikov has also moved for summary judgment. GS Group opposes the preliminary injunction and moves to dismiss the complaint or, in the alternative, for summary judgment. The court heard oral argument on the application for a preliminary injunction on October 22, 2012. Neither party sought an evidentiary hearing. I have decided the parties' dispositive motions on the written submissions. Fed. R. Civ. P. 78(b).

The essential issue that emerged from oral argument and the parties' submissions is this: Was Aleynikov an "officer" of GSCo, and therefore eligible for indemnification and advancement of legal fees? A "vice president"–Aleynikov indisputably held that title–would ordinarily be considered an "officer" in a corporate context. In a non-corporate partnership entity like GSCo, however, "officer" and "vice president" have no fixed definition. Moreover, it does not appear that Aleynikov, a computer programmer, performed functions normally associated with the status of officer or manager. The definition of a non-corporate "officer" in GS Group's By-laws is circular and unhelpful. Aleynikov argues that I should therefore let the burden of ambiguity fall on GS Group, take the title of "vice president" at face value, and declare him eligible for advancement of fees. GS Group urges, however, that "vice president" can be something of a courtesy title in its industry. It further alleges that it has established a process of appointment that clearly distinguishes between officers and non-officers. If true, this would be highly relevant; an entity may decide whom to designate as an officer. But because GS Group points to no such written policy, because it is in possession of all the facts on this point, and because there has been no discovery, it would be unfair to conclude from a blanket statement in an affidavit that it is true. Aleynikov is entitled to probe these matters.

In short, the record is undeveloped. The Court finds that Plaintiff has not met his burden of convincing this Court that a preliminary injunction is appropriate. In addition, the Court finds that there are genuine issues of material fact precluding summary judgment in either party's favor. Accordingly, Plaintiff's Application for a Preliminary Injunction and his Motion for Summary Judgment are **DENIED**. Defendant's Motion to Dismiss, or, in the alternative, for Summary Judgment is also **DENIED**.

## I.   BACKGROUND[3]

GSCo is a "broker-dealer" limited liability partnership organized under the laws of New York State. It is a non-corporate subsidiary of GS Group, the Goldman Sachs parent company, which is incorporated in the State of Delaware. The sole general partner of GSCo is The Goldman, Sachs & Co. L.L.C., a limited liability company organized under the laws of Delaware. The sole limited partner of GSCo is GS Group.

Mr. Aleynikov was employed by GSCo from May 7, 2007 through June 30, 2009 (his last day in the office was June 5). There he was part of a team of computer programmers responsible for developing source code relating to GSCo's high frequency trading system. During his employment at GSCo, Aleynikov held the title of "vice president." Defendant nevertheless contends that Aleynikov was not an officer of GSCo, but rather "a mid-level computer programmer with no managerial responsibilities." Def.'s Mem. in Resp. to Order to Show Cause and Opp. to Pl.'s Mot. Summ. J. and in Support of Def.'s Mot. to Dismiss or for Summ. J., Oct. 11, 2012, ECF No. 22 ("Def. Opp. & MSJ") at 2.

In April 2009, Mr. Aleynikov accepted an employment offer from Teza Technologies, a start-up company based in Chicago. Before leaving GSCo in June, Aleynikov allegedly copied and transmitted to his home computer and other devices, via a server in Germany, hundreds of thousands of lines of confidential source code. About a month later, Aleynikov flew to Teva's offices carrying a laptop and flash drive that allegedly contained the stolen source code. Immediately upon his return, he was arrested by the FBI at Newark Liberty International Airport and charged federally.

After an eight day jury trial in the United States District Court for the Southern District of New York, Mr. Aleynikov was convicted of (1) theft of trade secrets in violation of the Electronic Espionage Act ("EEA") (18 U.S.C. § 1832(a)(2) and (4)), and (2) transportation of stolen property in interstate commerce in violation of the National Stolen Property Act ("NSPA") (18 U.S.C. § 2314). Compl. ¶¶ 20-21; *see also United Stated v. Aleynikov*, 737 F. Supp. 2d 173 (S.D.N.Y. 2010). On March 18, 2011, Aleynikov was sentenced to 97 months of imprisonment. Compl. ¶ 22. On direct appeal, the United States Court of Appeals for the Second Circuit reversed the decision of the district court, reasoning that, while Aleynikov breached his confidentiality obligations to Goldman, his conduct did not fall within the scope of the charged federal offenses. The Court of Appeals held that (a) intangible property such as source code does not constitute stolen "goods," "wares" or "merchandise" under the NSPA, and (b) the government had failed to establish that GSCo's high frequency trading system was intended for interstate commerce as required by

---

[3]     Unless otherwise noted, facts recited in this section have been stated and not denied in the parties' Statements of Material Facts Not in Dispute or admitted elsewhere in their pleadings.

the EEA. *See United States v. Aleynikov,* 676 F. 3d 71 (2d Cir. 2012). Accordingly, a Judgment of Acquittal on both counts was entered on June 5, 2012. Compl. Ex. B. Shortly thereafter, on August 2, 2012, Aleynikov was rearrested in New Jersey and then indicted by a Manhattan Grand Jury for two offenses under New York State law. Van Splinter Decl., Ex. 5. Those state charges are pending.

Mr. Aleynikov has been represented by the New Jersey law firm of Marino, Tortorella & Boyle ("MTB") since April 2010. According to the Complaint, Aleynikov was "rendered impecunious" after paying about a quarter of the legal fees incurred during his defense of the federal charges.[4]

On August 24, 2012, Plaintiff's attorney Kevin Marino wrote to Defendant's attorney Matthew Friedrich, demanding that GS Group "honor its obligations" to indemnify Aleynikov for the legal expenses incurred in connection with his defense of the federal charges and to begin advancing funds, including a $500,000 retainer, for his defense of the state charges. *See* Compl. Ex. E. With that letter, Aleynikov provided the contractually-required "undertaking," *i.e.,* a promise to repay the advancement of legal fees and expenses if "it is ultimately determined that he is not entitled to be indemnified ...." Compl. Ex. E.

On September 25, 2012, Mr. Aleynikov petitioned this Court *via* an Order to Show Cause for a Preliminary Injunction seeking (1) indemnification for his legal fees and expenses incurred in the federal criminal proceedings, (2) advancement of legal fees and expenses for representation in the state criminal proceedings and (3) for this civil action seeking indemnification and advancement ("fees on fees"). Specifically, Aleynikov seeks indemnification of $2,383,002.56, advancement of "reasonable attorney's fees and expenses" and prejudgment interest on the yet-unpaid advancement, indemnification and fee claims. Compl. ¶¶ A-E.

## II.   LEGAL STANDARDS

### A. Preliminary Injunction

"A plaintiff seeking a preliminary injunction must establish

[1] that he is likely to succeed on the merits,

[2] that he is likely to suffer irreparable harm in the absence of preliminary relief,

[3] that the balance of equities tips in his favor, and

---

[4] "In defending the Federal Charges, Aleynikov incurred legal fees and expenses totaling $2,383,002.56, of which he was only able to pay $547,960.00 ...." Compl. ¶ 26.

[4] that an injunction is in the public interest."

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (line breaks and numbering added); *accord American Express Travel Related Servs., Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 366 (3d Cir. 2012); *Kos Pharm., Inc. v. Andrx Corp.* 369 F. 3d 700, 708 (3d Cir. 2004); *see Adams v. Freedom Forge Corp.*, 204 F.3d 475, 486 (3d Cir. 2000) (movant bears the burden of establishing these elements). A Court will consider all four factors, but the first two are essential: A court may not grant injunctive relief, "regardless of what the equities seem to require," unless plaintiffs carry their burden of establishing *both* a likelihood of success and irreparable harm. *Adams*, 204 F. 3d at 484; *accord Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 197 (3d Cir. 1990) (placing particular weight on the probability of irreparable harm and the likelihood of success on the merits, stating: "[W]e cannot sustain a preliminary injunction ordered by the district court where either or both of those prerequisites are absent." (quoting *In re Arthur Treacher's Franchisee Litigation*, 689 F.2d 1137, 1143 (3d Cir.1982)); *Morton v. Beyer*, 822 F.2d 364, 367 (3d Cir.1987); *Freixenet, S.A. v. Admiral Wine & Liquor Co.*, 731 F.2d 148, 151 (3d Cir.1984); *American Express*, 669 F.3d at 366, 374.

That already difficult burden may be heightened further in cases where, as here, Plaintiff is asking the Court to order an affirmative act rather than a stay to maintain the status quo. *See Bennington Foods LLC v. St. Croix Renaissance, Group LLP*, 528 F.3d 176, 179 (3d Cir. 2008) ("where the relief ordered by the preliminary injunction is mandatory and will alter the status quo, the party seeking the injunction must meet a higher standard of showing irreparable harm in the absence of an injunction."); *Acierno v. New Castle County*, 40 F.3d 645, 653 (3d Cir. 1994) ("A party seeking a mandatory preliminary injunction that will alter the status quo bears a particularly heavy burden in demonstrating its necessity.") That principle must, however, be applied with care under the peculiar circumstances of this case. Aleynikov's claimed entitlement to preliminary relief arises, not from a mere expectation that he will ultimately prevail, but from a contractual provision providing for "advancement" of fees. *See Ridder v. CityFed Fin. Corp.*, 47 F.3d 85, 87 (3d Cir.1995) (issue before the district court was not whether movants were likely to prevail in the underlying litigation, but whether they were likely to prevail in their pursuit of advancement).

## B. Motion to Dismiss

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint if it fails to state a claim upon which relief can be granted. The moving party bears the burden of showing that no claim has been stated. *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005). In deciding a motion to dismiss under Rule 12(b)(6), a court must take all allegations in the complaint as true and view them in the light most favorable to the plaintiff. *See*

*Warth v. Seldin*, 422 U.S. 490, 501 (1975); *Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts Inc.*, 140 F.3d 478, 483 (3d Cir. 1998); *see also Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) ("reasonable inferences" principle not undermined by subsequent Supreme Court case law).

Although a complaint need not contain detailed factual allegations, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, the factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, such that it is "plausible on its face." *See id.* at 570; *see also Umland v. PLANCO Fin. Serv., Inc.*, 542 F.3d 59, 64 (3d Cir. 2008). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (citing *Twombly*, 550 U.S. at 556). While "[t]he plausibility standard is not akin to a 'probability requirement' . . . it asks for more than a sheer possibility." *Iqbal*, 129 S.Ct. at 1949 (2009).

### C. Cross-Motions for Summary Judgment

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (summary judgment is appropriate where "there is no genuine issue of material fact to be resolved and the moving party is entitled to judgment as a matter of law."); *Alcoa, Inc. v. U.S.*, 509 F.3d 173, 175 (3d Cir. 2007). Summary judgment is desirable because it eliminates unfounded claims without resort to a costly and lengthy trial, *Celotex*, 477 U.S. at 327, but a court should grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The burden of showing that no genuine issue of material fact exists rests initially on the moving party. *Celotex*, 477 U.S. at 323. Once the moving party has made a properly supported motion for summary judgment, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see Anderson*, 477 U.S. at 247-48. In evaluating a summary judgment motion, a court must view all evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976).

6

Mr. Aleynikov suggests that the Court treat this matter, either directly or by analogy, as a "summary proceeding." I find that procedure, borrowed from the Delaware Court of Chancery, to be inapplicable. *See* Section V.A.1, *infra*.

### III.   DISCUSSION

This case turns primarily on one question: whether Mr. Aleynikov was an "officer" of GSCo within the meaning of Section 6.4 of the GS Group By-laws.

#### A. Indemnification and Advancement of Fees Under the Delaware GCL and the GS Group By-laws

##### i.   Delaware Law

As to issues of indemnity and advancement, the By-laws of GS Group, a Delaware corporation, incorporate Delaware law. "Section 145(a) and (b) of the Delaware General Corporation Law gives corporations the power to indemnify their current and former corporate officials from expenses incurred in legal proceedings 'by reason of the fact that the person is or was a director, officer employee or agent of the corporation'." *Homestore, Inc. v. Tafeen*, 888 A.2d 204, 211 (Del. 2005) (quoting Del. Code Ann. tit. 8, § 145(a) & (b)).[5] Indemnification

---

[5] That section of the DGCL provides in relevant part:

> (a) A corporation shall have power to indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of the corporation) by reason of the fact that the person is or was a director, officer, employee or agent of the corporation, or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by the person in connection with such action, suit or proceeding if the person acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the corporation, and, with respect to any criminal action or proceeding, had no reasonable cause to believe the person's conduct was unlawful. . . .

> (b) A corporation shall have power to indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed

action or suit by or in the right of the corporation to procure a judgment in its favor by reason of the fact that the person is or was a director, officer, employee or agent of the corporation, or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against expenses (including attorneys' fees) actually and reasonably incurred by the person in connection with the defense or settlement of such action or suit if the person acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the corporation and except that no indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable to the corporation unless and only to the extent that the Court of Chancery or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which the Court of Chancery or such other court shall deem proper.

. . .

(e) Expenses (including attorneys' fees) incurred by an officer or director of the corporation in defending any civil, criminal, administrative or investigative action, suit or proceeding may be paid by the corporation in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of such director or officer to repay such amount if it shall ultimately be determined that such person is not entitled to be indemnified by the corporation as authorized in this section. Such expenses (including attorneys' fees) incurred by former directors and officers or other employees and agents of the corporation or by persons serving at the request of the corporation as directors, officers, employees or agents of another corporation, partnership, joint venture, trust or other enterprise may be so paid upon such terms and conditions, if any, as the corporation deems appropriate.

Del. Code Ann. tit. 8, § 145 (West 2012).

is not appropriate "until after the defense to legal proceedings has been successful on the merits or otherwise." In addition, however, DGCL § 145(e) allows for, and many corporate by-laws require, the advancement of expenses to provide "immediate interim relief from the personal out-of-pocket financial burden of paying the significant on-going expenses inevitably involved with investigations and legal proceedings." *Id.* at 211 (internal quotation omitted). The right to indemnification and the right to advancement are "separate and distinct." Advancement depends on the nature, not the merits, of the claims asserted against the corporate official; indemnification, by contrast, depends upon whether the officer's defense ultimately succeeds. *See Ridder*, 47 F.3d at 87 ("Under Delaware law, appellants' right to receive the costs of defense in advance does not depend upon the merits of the claims asserted against them, and is separate and distinct from any right of indemnification they may later be able to establish."). The right to advancement is nevertheless forward-looking to this extent:  "[O]nly those fees which may ultimately be eligible for indemnification may be advanced: a demand for expenses for which indemnification would not be possible would not be reasonable." *Confederate Motors, Inc. v. Terny*, 859 F. Supp. 2d 181, 187 (D. Mass. 2012); *accord Underbrink v. Warrior Energy Serv. Corp.*, No. 2982–VCP, 2008 WL 2262316, at *16 & n. 148 (Del. Ch. May 30, 2008).

### ii. GS Group's By-laws

Section 6.4 of the By-laws of the parent corporation, GS Group, provides for indemnity and advancement of legal fees as follows:

> The Corporation shall indemnify to the full extent permitted by law any person made or threatened to be made a party to any action, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of the fact that such person or such person's testator or intestate is or was a director or officer of the Corporation, is or was a director, officer, trustee, member, stockholder, partner, incorporator or liquidator of a Subsidiary of the Corporation . . . . Expenses, including attorneys' fees, incurred by any such person in defending any such action, suit or proceeding shall be paid or reimbursed by the Corporation promptly upon demand by such person and, if any such demand is made in advance of the final disposition of any such action, suit or proceeding, promptly upon receipt by the Corporation of an undertaking of such person to repay such expenses if it shall ultimately be determined that such person is not entitled to be indemnified by the Corporation.  The rights provided to any person by this by-law shall be

> enforceable against the Corporation by such person,
> who shall be presumed to have relied upon it in
> serving or continuing to serve as a director or officer or
> in such other capacity as provided above.

Van Splinter Decl., Ex. 1 ("By-laws") § 6.4.

Thus the GS Group By-laws provide for indemnification, as authorized by DGCL § 145. The By-laws are more liberal than the statute in that, if certain conditions are met, both indemnification and advancement are mandatory. By-laws § 6.4 ("*shall* be paid or reimbursed by the Corporation"). The Bylaws do, however, restrict indemnification and advancement to a particular class of persons. Thus, the By-laws supply their own definition of an eligible "officer":

> .... the term "officer,"
> [1] when used with respect to the Corporation, shall
> refer to any officer elected by or appointed pursuant to
> authority granted by the Board of Directors of the
> Corporation pursuant to clauses (i), (ii), (iii) and (iv) of
> Section 4.1 of these by-laws,
> [2] when used with respect to a Subsidiary or other
> enterprise that is a corporation, shall refer to any
> person elected or appointed pursuant to the by-laws of
> such Subsidiary or other enterprise or chosen in such
> a manner as is prescribed by the by-laws of such
> subsidiary or other enterprise or determined by the
> board of directors of such Subsidiary or other
> enterprise, and
> [3] when used with respect to a Subsidiary or other
> enterprise that is not a corporation or is organized in a
> foreign jurisdiction, the term "officer" shall include in
> addition to any officer of such entity, any person
> serving in a similar capacity or as the manager of such
> entity . . . .

(By-Laws § 6.4; numbering of categories [1], [2] and [3] and line breaks added for ease of reference.)

Mr. Aleynikov seeks indemnification and advancement as an "officer." The Parties agree that GSCo falls within By-laws § 6.4, Category [3], quoted above; that is, GSCo is a non-corporate subsidiary, specifically an unincorporated limited liability partnership. Aleynikov claims to be an officer of GSCo because he held the title of "vice president." He does not claim that he served "in a similar capacity" to an officer or that he served as manager of GSCo.

Thus the material question before the Court is whether Aleynikov's position as vice president is properly defined as that of an "officer" of GSCo within the meaning of Section 6.4, Category [3].

## IV.   Plaintiff's Application for a Preliminary Injunction

### A.   Likelihood of Success on the Merits

To determine whether to grant a preliminary injunction, the Court must first determine whether Mr. Aleynikov is likely to succeed on the merits of his claims in *this* action, as opposed to the underlying criminal case. *See Ridder*, 47 F.3d at 87 (regarding advancement of fees, the issue was not whether movants were likely to prevail in the underlying litigation, but whether they were likely to prevail on the advancement claim itself).[6]

While the requirement of "likelihood of success on the merits" is satisfied "if the moving party make[s] a showing of a reasonable probability, not the certainty, of success on the merits . . . a preliminary injunction cannot be issued when there are disputed issues of fact." *Apollo Technologies Corp. v. Centrosphere Indus. Corp.*, 805 F. Supp. 1157, 1191 (D.N.J. 1992) (internal quotations and citations omitted); *accord Charles Simkin & Sons, Inc. v. Massiah*, 289 F.2d 26, 29 (3d Cir.1961) (holding that disputed material facts prevent issuance of injunctive relief); *ACE Am. Ins. Co. v. Wachovia Ins. Agency Inc.*, CIV.A.08-4369 (JLL), 2008 WL 4630486 (D.N.J. Oct. 17, 2008) aff'd, *Ace Am. Ins. Co. v. Wachovia Ins. Agency Inc.*, 306 F. App'x 727 (3d Cir. 2009), *Gruntal & Co., Inc. v. Steinberg*, 843 F. Supp. 1, 16 (D.N.J. 1994). It has been said that "upon an application for a preliminary injunction to doubt is to deny." *Madison Square Garden Corp. v. Braddock*, 90 F.2d 924, 927 (3d Cir. 1937); *Vista India v. Raaga, LLC*, 501 F. Supp. 2d 605, 611 (D.N.J. 2007) (same). That formulation, though catchy, is perhaps exaggerated; surely relief does not require the absence of *any* doubt. At this point, however, the Court's doubts as to Mr. Aleynikov's status as an officer remain substantial.

I read Section 6.4 of the By-laws as providing a different definition of "officer" for each of the three classes of business entities within GS Group's organization: (1) GS Group, the parent corporation; (2) corporate subsidiaries; and (3) non-corporate subsidiaries.

---

[6]   Accordingly, the Court is not overly concerned at this stage with the merits of the allegations of criminal wrongdoing. Mr. Aleynikov's successful defense of the federal criminal charges is relevant, however, to indemnification for legal fees incurred in those federal proceedings. At oral argument, GS Group's Attorney conceded that *if* Mr. Aleynikov were an officer then the dismissal of the federal charges on appeal constituted a successful defense that would support indemnification. *See* PI Tr. 41:19-21.

Category [1], an officer of the "Corporation" (*i.e.*, GS Group), is defined as "any officer elected by or appointed pursuant to authority granted by the Board of Directors of the Corporation pursuant to clauses (i), (ii), (iii) and (iv) of Section 4.1 of these by-laws." And Section 4.1 provides that "the Board of Directors … may elect (i) one or more Chairmen of the Board and/or one or more Vice Chairmen of the Board from among its members, (ii) one or more Chief Executive Officers, one or more Presidents and/or one or more Chief Operating Officers, (iii) one or more Vice Presidents, one or more Treasurers and/or one or more Secretaries …." By-laws § 4.1.

By its explicit terms, Category [1] (incorporating Section 4.1) refers to officers of the parent corporation, not any corporate or non-corporate subsidiary. "Officers" of GS Group are thus defined to include persons elected by GS Group's Board to serve in various capacities, including that of "Vice President[]." Setting aside Category [1]'s explicit limitation of its scope, its structure is incompatible with that of a non-corporate entity like GSCo. GSCo does not, for example, possess a board of directors.

Category [2], an officer of a "Subsidiary or other enterprise that is a corporation," is defined as "any person elected or appointed pursuant to the by-laws of such Subsidiary or other enterprise or chosen in such a manner as is prescribed by the by-laws of such subsidiary or other enterprise or determined by the board of directors of such Subsidiary or other enterprise." By-laws § 6.4. By its explicit terms, this provision is confined to subsidiaries of GS Group that are corporations. Category [2], like Category [1], refers to corporations, boards of directors, and the like, and it could not be readily adapted to a non-corporate setting even if there were reason to try. And there is no reason to try; non-corporate entities are explicitly covered by a third category.

Category [3], an officer of "a Subsidiary or other enterprise that is not a corporation or is organized in a foreign jurisdiction," is defined as "any officer of such entity, [and] any person serving in a similar capacity or as the manager of such entity." By-laws § 6.4. Category [3] is clearly intended as a catchall, to cover a range of domestic and foreign entities that are not structured as corporations. Indisputably, GSCo is a non-corporate subsidiary, and I am persuaded that the issue here is governed solely by Category [3].

Unfortunately, the phrasing of Category [3] is less than clear. It begins by stating that "the term 'officer' shall include in addition to any officer of such entity…." Thus, for a non-corporate subsidiary, an "officer" is defined as, *inter alia,* "any officer." This is not helpful; indeed, it is circular. It is probably inevitable, then, that neither party's interpretation of this provision is wholly consistent or problem-free.

Mr. Aleynikov's primary argument, especially as refined at oral argument, is straightforward. His job title was "vice president." He is therefore entitled to mandatory indemnification and advancement because the "plain

meaning" of the term "officer" includes vice presidents. Pl.'s Reply Mem. and Opp. to Def.'s Mot. Summ. J., Oct., 16, 2012, ECF No. 26 ("Pl. Reply & Opp.") at 2. As a backup, however, Aleynikov has a less direct argument. He maintains that, to the extent Category [3] is unclear, the designation of corporate officers in Category [1] provides "the only frame of reference for determining those persons who qualify as officers of a non-corporate subsidiary." The court should, he says, look to "§ 4.1 of the By-Laws, which indisputably includes Vice Presidents as officers." Pl. Reply & Opp. at 14. This is essentially a suggestion that, as to this limited liability partnership, the court should reason by extension from the designation of vice presidents as *corporate* officers.[7]

Defendant GS Group would maintain a sharper distinction among the three subsections of Section 6.4. The definition of "officer status" for non-corporate subsidiaries such as GSCo, says Defendant, is very different from the definition of officers of the parent corporation, GS Group. Defendant paraphrases Category [3] as follows: Officers of GSCo comprise "(1) one who is an officer of GSCo; (2) one who serves in a capacity similar to that of an officer; (3) one who is a manager of GSCo." Def. Opp. & MSJ at 14.

GS Group acknowledges the circularity of defining an "officer" to include "one who is an officer" or "similar to … an officer." It argues, however, that established practices of the GS Group subsidiaries provide a practical definition. "Officers of GSCo," says GS Group, are appointed *only* by "formal resolution." *Id.* Thus we can tell who is an officer of GSCo by reviewing its formal resolutions. If established as authoritative, this appointment procedure would be highly relevant.

For this proposition, however, Defendant relies on the affidavit of Matthew Tropp, managing director and an Associate General Counsel of GSCo. Mr. Tropp states that he is "responsible for helping to oversee the process by which officers are appointed within certain U.S. subsidiaries of GS Group," and therefore has "personal knowledge of the corporate structure of GS Group, and the process by which … GSCo appoint[s] officers." Tropp Aff. ¶ 5, ECF No. 19. According to his affidavit:

---

[7]     Initially, Aleynikov argued that Section 4.1 applies not only to the Corporation (*i.e.*, GS Group, the parent corporation), but to all Goldman Sachs entities. *See* Plaintiff's Memorandum of Law in Support of Application for an Order to Show Cause Why Defendant Should not Advance Plaintiff's Legal Fees and Expenses and in Support of Motion for Summary Judgment, Sep. 25, 2012, ECF No. 2 ("Pl. App. & MSJ") at 13. In his Reply and at oral argument counsel for Aleynikov softened his position that the Section 4.1 definition applies literally or directly to non-corporate subsidiaries, but still argued that it is relevant, as described above. That concession seems sound.

> GSCo, which is governed by a Memorandum of Agreement between the Goldman, Sachs & Co. L.L.C. as the sole general partner, and GS Group, as the sole limited partner, appoints officers empowered to act on its behalf. To appoint an officer of GSCo, the sole general partner adopts a written resolution electing a particular person to hold a particular office of GSCo. To remove an officer, the sole general partner adopts a written resolution removing a particular person from the office of GSCo that he or she held before removal. . . . Executed resolutions appointing officers of GSCo are kept with the records of GSCo.

Tropp. Aff. ¶¶ 7-8. Tropp states that he has reviewed the relevant records and finds that "Sergey Aleynikov was never appointed an officer of GSCo by a written resolution of the general partner." Id. at ¶ 9.

The Court accepts that, as Mr. Tropp points out, GSCo "is governed under a Memorandum of Agreement" (herein, the "Partnership Agreement"). Def. Opp. & MSJ at 11; Van Splinter Decl., Ex. 2 (Partnership Agreement). But that Partnership Agreement does *not* contain a definition of "officer." And Mr. Tropp's explanation of the procedure for appointment and removal of officers of GSCo—although stated in close proximity to his reference to the Partnership Agreement—is not a summary of anything that actually appears in the Partnership Agreement. In short, Defendant does not link this appointment procedure to any preexisting written policy. Rather, its existence is supported only by Tropp's statement of what the procedure is in the GS Group family of non-corporate subsidiaries.

Defendant's only argument that proceeds directly from the text of the Partnership agreement is a weak one. Counsel urges an indirect inference from the fact that Aleynikov allegedly lacked one of the attributes of an officer: the power to appoint attorneys-in-fact to represent GSCo. Article 1, § 11 of the Partnership Agreement confers upon "any officer of the partnership . . . full power and authority . . . to appoint one or more of the partnership's employees as the partnership's attorney in fact . . . ." Def. Opp. & MSJ at 15. Defendant argues that because Aleynikov "could not contend that he ever had the above-described authority . . . Aleynikov was never an officer of the GSCo." Id. at 15-16. Whether Aleynikov "could contend" that he exercised an officer's prerogative of appointing attorneys-in-fact is perhaps relevant, but it is not strong evidence as to his officer status.

Defendant GS Group urges that its position here is a natural one. Partnerships, because they are managed chiefly through their partners, are not required to have any officers at all. For GSCo to possess only a small number of officers, then, is "consistent with both New York law (which governs the partnership) and with GSCo's past practices." Id. at 17-18.

14

GSCo may indeed have a "very limited" number of officers; it does not necessarily follow that it has none. Nor does it necessarily follow (although it might) that Mr. Aleynikov is not among their number. The record does not identify GSCo's officers or say how many there are. Nor does it describe the process by which any particular person was appointed to be an officer, even by way of example. It does attach one resolution changing the status of a Co-Chief Legal Officer to that of a Chief Legal officer. *See* Tropp. Aff. Ex. 1. Before accepting the generalities in Mr. Tropp's affidavit, a fact finder would want to see some of those underlying facts, which are in Defendant's control.

Somewhat inconsistently, Defendant also argues that Aleynikov was one of a multitude; he was among "many thousands of employees given the functional title of 'vice president' in the United States, or its equivalent overseas, and one of approximately two thousand such employees in the global Securities Division at the firm." Def. Opp. & MSJ at 2.[8]

It may be that the Goldman Sachs organization (or the financial industry generally) confers the title of vice president liberally. Although I make no such assumption on the present record, it may be that the By-laws, with equal liberality, grant mandatory indemnification to all who possess the title of vice-president. Whether such an approach is too generous is not for this Court to say. It is an issue wholly controlled by the By-laws, the drafting of which was within GS Group's control.

GS Group concedes that it has, in particular cases, chosen to indemnify persons who fell outside of its claimed definition of "officer." Indeed, GS Group states, the By-laws "were drafted so as to allow permissive (rather than mandatory) indemnification of a broader class of persons, including employees in general." Id. at 17. At this early stage, that concession could be viewed as favorable evidence for GS Group, but it could also be viewed as "spin"– an attempt to explain away past indemnity decisions that are inconsistent with GS Group's interpretation of the By-laws here. Again, I make no assumptions. I believe, however, that any finder of fact would want to test whether those decisions were purely discretionary, or whether they tend to suggest that

---

[8]    It is unclear whether this description encompasses corporate entities, non-corporate entities, or both. Defendant's term "functional title" seems to connote something like "a title that shouldn't be taken literally." It does not seem to mean "a title that corresponds to the person's function," *i.e.,* his real-world duties. At various points, however, the parties have used the word "functional" in both senses.

Plaintiff does not dispute that many bear the title of vice president, but maintains that his relative seniority is irrelevant so long as he possesses the title of "vice president." *See* Pl. Reply & Opp. at 1-2 ("a functional analysis of Aleynikov's role at the firm . . . does not apply to those, who, by virtue of their title, are officers").

Defendant has historically interpreted Section 6.4 more broadly. These facts, too, are entirely in Defendant's control, and there has been no discovery.

In short, I find the factual record of this case to be insufficiently developed.

The question remains whether, despite such factual disputes, precedent compels (or likely would compel) relief for Plaintiff as a matter of law. Aleynikov cites "myriad cases" which "have held that vice-presidents are officers." Pl. Reply & Opp. at 19. That statement is true as far as it goes. Most of the cases, however, do not find that vice presidents are officers *merely by virtue of holding that title,* which is Plaintiff's primary contention here. Those courts, in a variety of contexts, have found it necessary to perform a deeper analysis. They have probed employees' responsibilities and duties to determine whether they should be deemed officers *despite* their job titles, or based on factors *in addition to* their job titles. *See, e.g. In re Foothills Texas, Inc.,* 408 B.R. 573 (Bankr. D. Del. 2009) (fact that employees of Chapter 11 debtor held title of "vice president" did not determine whether they were "officers" of debtor for purpose of bankruptcy statute limiting retention payments to insiders); *Roller Bearing Industries, Inc. v. Paul* , 3:05-CV-508-S, 2010 WL 1257715, *2 (W.D. Ky. Mar. 26, 2010) ( "while title alone might not be enough on its own to justify finding an employee to be an officer of a company," annual reports in which individual was labeled "Vice President and identified as an officer" were a sufficient basis); *EMC Corp. v. Allen,* 975972B, 1997 WL 1366836, *3 (Mass. Super. Dec. 15, 1997) (former vice president who "throughout his employment at EMC . . . worked in senior marketing positions . . . had access to confidential proprietary information [and] was compensated over $1 million dollars in salary, bonuses and stock options" was likely an "officer" within the meaning of a non-compete agreement).[9]  The few cases that do seem to rely on title alone do so in contexts far removed from that of this case. *Brakke v. Idaho Dep't of Corr.,* 2012 U.S. Dist. LEXIS 139973 (D. Idaho Sept. 25, 2012) (the "title 'Regional Vice President' connotes an officer role to a normal observer" and suggests he had authority to receive service of process); *Ter Bush & Powell, Inc. v. State Tax Comm'n,* 58 A.D.2d 691, 395 N.Y.S.2d 762, 763-64 (3d Dep't 1977) (franchise tax statute that covered salary and compensation paid to "elected or appointed officers" applied, despite an assertion that "vice president" or "senior vice president" were "honorary" titles, given to salespeople who lacked any executive authority).

---

[9]     In addition, a number of these cases involve Vice Presidents of specific departments (Marketing, Sales, Development) so the title itself provided at least some indication of the individual's role within the company. *See, e.g., Homestore, Inc. v. Tafeen,* 888 A.2d 204 (Del. 2005) (officer status was not challenged where individual was Vice President of Business Development and later Executive Vice President of Business Development, Ads and Sales).

Plaintiff suggests that if the Court finds the GS Group's By-laws to be ambiguous, it should employ the interpretive principle of *contra proferentem*, "which is that ambiguities in a contract should be construed against the drafter." *Twin City Fire Ins. Co., v. Delaware Racing Assoc'n*, 840 A.2d 624, 630 (Del. 2003). I agree that Section 6.4 alone does not clearly define the categories of individuals who are officers of GS Group's non-corporate subsidiaries such as GSCo. I suspect, however, that the answer to this question of contract interpretation may turn on matters of fact that cannot be resolved on the present record. At some point the Court may have to employ interpretive tools of "last resort," but to do so at this stage would be premature.

I find that Plaintiff has not met his burden of establishing a likelihood of success on the merits. His status as an officer, and therefore his attendant eligibility for indemnification and advancement, remain in dispute. This, even standing alone, is fatal to his application for preliminary injunction.

## B. Irreparable Harm

The second *sine qua non* of a preliminary injunction is immediate irreparable harm that cannot be redressed by a legal or equitable remedy following trial. *See* cases cited at § II.A., *supra*; 11A Fed. Prac. & Proc. Civ. § 2948.1 (2d ed). Although the Plaintiff's failure to establish likelihood of success is sufficient to preclude preliminary injunctive relief, I discuss the irreparable harm issue for the parties' guidance. The irreparable harm factor presents a far closer issue.

Neither a mere risk of future harm nor a compensable, temporary loss of money constitutes irreparable harm. *See Acierno*, 40 F.3d at 653; *accord Cont'l Group, Inc. v. Amoco Chemicals Corp.*, 614 F.2d 351, 359 (3d Cir. 1980) ("more than a risk of irreparable harm must be demonstrated. The requisite for injunctive relief has been characterized as a clear showing of immediate irreparable injury, or a presently existing actual threat") (internal citations and quotations omitted)); *see also Aquila, Inc. v. Quanta Services, Inc.*, 805 A.2d 196, 202-03 (Del. Ch. 2002) ("a preliminary injunction is an extraordinary remedy, which will not issue unless it has been earned and will be denied where the remedy sought is excessive in relation to, or unnecessary to prevent, the injury threatened."). "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date … weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90 (1974). Accordingly, in order to meet his burden, Mr. Aleynikov must demonstrate "a significant risk that he … will experience harm that cannot adequately be compensated after the fact by monetary damages. *Frank's GMC Truck Center, Inc. v. General Motors Corp.*, 847 F.2d 100, 102–03 (3d Cir.1988). *See also Morton v. Beyer*, 822 F.2d 364, 371– 72 (3d Cir.1987); *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484-85 (3d Cir. 2000).

Mr. Aleynikov contends, not merely that he will have to wait for repayment of the funds to pay his attorneys, but that denial of a preliminary injunction will impair his criminal defense. In *Acierno,* the Third Circuit distinguished between cases in which delay in the exercise of some right caused monetary loss, and cases in which the movant's rights would not be "merely impaired" but "potentially barred" resulting in "extreme deprivation." *See Acierno,* 40 F.3d at 653–55 (discussing, *inter alia, Opticians Association of America v. Independent Opticians of America,* 920 F. 2d 187 (3d Cir. 1990), *Morton v. Beyer,* 822 F.2d 364, 371–72 (3d Cir.1987), *Fitzgerald v. Mountain Laurel Racing, Inc.,* 607 F.2d 589 (3d Cir. 1979)). Such an impairment of an applicant's ability to defend himself in a criminal case can therefore constitute irreparable harm. *See Ridder,* 47 F.3d at 87 (Applicants made "strong showing that, unless defense costs were advanced to them, their ability to defend the RTC action would be irreparably harmed"). The Court does not take lightly the potential impact of a delay in advancement of fees by GS Group.

How is the court to analyze the potential harm?

Assume (for purposes of argument only) that Mr. Aleynikov does not prevail on his claims for advancement (or indemnity). The baseline consideration—not the only one, of course—is that he will not be *deprived* of a legal defense. Even a completely indigent criminal defendant is entitled to representation by the public defender or an attorney appointed pursuant to the Criminal Justice Act. *See Gideon v. Wainwright,* 372 U.S. 335, 344 (1963); Criminal Justice Act, 18 U.S.C. § 3006(A)(a) ("Each United States district court ... shall place in operation throughout the district a plan for furnishing representation for any person financially unable to obtain adequate representation ...."). And this Court obviously could never find that representation by the public defender or CJA counsel *in itself* constitutes "irreparable harm." I believe the applicant for an injunction must show something more – *i.e.,* that the defense of *his* particular case will be *impaired* by the denial of preliminary injunctive relief. *See Ridder,* 47 F.3d at 87; *McPeek v. Travelers Cas. & Sur. Co. of Am.,* 2:06-CV-114, 2006 WL 1308087, *5 (W.D. Pa. May 10, 2006) (interpreting *Ridder* to instruct that the Third Circuit requires "some actual evidence of irreparable harm, e.g., an affidavit, testimony or documents" where plaintiff claims he will be irreparably harmed unless fees are advanced).

On the other hand, assume (again, for purposes of argument only) that Aleynikov will prevail on his claims for advancement (or indemnity). If so, payment of the fees owing to MTB will be delayed, but not denied. The baseline consideration—again, not the only one—is that such a delay in payment, standing alone, is compensable in damages.

Aleynikov's claim of harm, however, is perhaps a subtler one. That is, he may be claiming that the MTB firm will be unwilling to take on the risk of representing him while this action for advancement or indemnity is pending and uncertain, *even if* it eventually turns out that he is entitled to prevail. In

this way, he might be denied, not counsel, but counsel of his choice who are thoroughly familiar with his case and are best positioned to continue with his defense. MTB did not submit "actual evidence of irreparable harm, e.g., an affidavit, testimony or documents" attesting to this point. At oral argument, however, Mr. Marino did represent that Aleynikov's defense would be impaired if he were deprived of the counsel of his choice two years into the firm's representation of him. *See* PI Tr. 50:12 – 51:15.

Neither MTB nor Aleynikov has squarely, under oath or otherwise, stated that, absent preliminary relief, the firm will cease to represent him. Indeed, MTB has, with admirable professionalism, zealously represented Aleynikov since April 2010 in the federal case, incurring fees of $2,383,002.56 of which Aleynikov paid $547,960.00 before exhausting his resources. I do not suggest that MTB is obligated or should be expected to continue such unpaid representation (or at least absorb the risk of nonpayment) forever. But it is for MTB to decide how far to extend itself. MTB has appeared on Aleynikov's behalf in the New York State criminal matter with no assurance of further payment.[10] MTB must determine for itself whether a half million dollars plus the uncertain possibility of advancement or indemnification is sufficient compensation.

In short, MTB's continuing representation of Mr. Aleynikov indisputably constitutes an economic risk and hardship for the firm. If Aleynikov is ultimately successful in his claim for advancement and indemnification, counsel will be compensated, albeit tardily. If he is not successful, then MTB must either be satisfied with an IOU or seek to withdraw in favor of appointed counsel, but that is a risk the parties took on. It cannot be denied that it would be preferable for Aleynikov to keep his current counsel. It appears that uncertainty surrounding their compensation may place their continued retention in jeopardy, although there has not been a factual showing on that point.

Irreparable harm is a close question, and I might find that an imminent loss of counsel, if properly established by affidavits or testimony, would cause this factor to tip in Aleynikov's favor. As noted above, however, the Court's

---

[10] Under the Rules of Professional Conduct for both New York and New Jersey, MTB may not have unfettered discretion to withdraw as Mr. Aleynikov's attorney. NY ST RPC Rule 1.16(d) ("If permission for withdrawal from employment is required by the rules of a tribunal, a lawyer shall not withdraw from employment in a matter before that tribunal without its permission. When ordered to do so by a tribunal, a lawyer shall continue representation notwithstanding good cause for terminating the representation."); NJ R RPC 1.16(c) ("A lawyer must comply with applicable law requiring notice to or permission of a tribunal when terminating a representation. When ordered to do so by a tribunal, a lawyer shall continue representation notwithstanding good cause for terminating the representation.")

resolution of the likelihood of success factor is sufficient to require denial of a preliminary injunction application.

I will discuss more briefly the remaining two factors.

### C. Balancing of the Equities

Mr. Aleynikov reasons that because GS Group is a multi-billion dollar corporation, advancement of a few million dollars in attorney's fees could not significantly harm it. The Court agrees with Defendant that "the equities do not rest simply on the basis of size or wherewithal." Def's Opp. & Mot. Sum. J. at 22. *See Am. Hosp. Supply Corp. v. Hosp. Products Ltd.*, 780 F.2d 589, 598 (7th Cir. 1986) (attaching "no legal significance" to the relative economic wherewithal of the parties, unless the smaller, weaker party faces bankruptcy because bankruptcy imposes social costs); *In re Arthur Treacher's Franchisee Litig.*, 689 F.2d at 1145 (finding that the district court erred in granting preliminary relief that essentially amounted to a final award of damages simply on the basis of the movant's failing financial health). The balance of equities is not assessed based on a redistributive, or Robin Hood, rationale. I believe it is proper to consider, however, that an improperly denied injunction would probably have a greater impact upon Mr. Aleynikov and his criminal defense than an improperly granted injunction would have upon GS Group.

There is a potential hardship to GS Group. Mr. Aleynikov forthrightly acknowledges that his undertaking to repay the Corporation, should it ultimately be found that he is not entitled to advancement, is virtually worthless. A preliminary award, because it is unlikely to be repaid, would in practical terms constitute a final award. *See id.* at 145 ("We are satisfied that a preliminary injunction which ordered the payment of monies where the underlying contract is disputed, misconceives the equitable nature and purpose of an injunctive proceeding."). On the other hand, however, GS Group knowingly bargained for this outcome. It certainly was aware that legal fees could exhaust an employee's resources. And in return for its agreement to advance fees, it could have adopted By-laws that required more substantial security than a mere "undertaking" (*i.e.*, a promise). But clearly it did not.[11]

---

[11]    Aleynikov's lack of funds bears on more than one issue. As noted, it supports Aleynikov's claim of irreparable harm inasmuch as he is otherwise unable to afford counsel. On the other hand, it exposes GS Group to a risk of ultimate harm if a preliminary injunction were to issue based on an inaccurate prediction of plaintiff's success on the merits.

Jumping ahead somewhat, Mr. Aleynikov's straitened circumstances further imply that he would be unable to post a bond. To protect the other party and to prevent the balance of harms from tipping too far, Federal Rule 65 requires that any preliminary injunction be secured by a bond – and it speaks in mandatory terms. *See* Fed. R. Civ. P.65(c) ("The court may issue a preliminary injunction ... only if the movant gives security in an amount that

All in all, I find that this factor is in the zone of neutrality, but tips in Aleynikov's direction.

### D. The Public Interest

The court must also consider whether a preliminary injunction would generally promote public policies, and specifically promote the policy intentions behind the statutory and contractual provisions for indemnification and advancement. Numerous cases provide substantially similar recitations of the policy reasoning behind DGCL § 145:

> The public policy served by authorizing the advancement and indemnification of litigation expenses incurred by officers and directors is well-settled. Without affording this protection, corporations would find it difficult to retain high-quality directors and officers, especially ones willing to make socially useful decisions that involve economic risk. By authorizing the provision of indemnity and advancement within certain statutory guidelines, the General Assembly sought to encourage well-qualified persons to serve as directors and officers of Delaware corporations and, in that capacity, to be willing to commit their corporations, after the exercise of good faith and care, to risky transactions that promise a lucrative economic return.

*Fasciana v. Elec. Data Sys. Corp.,* 829 A.2d 160, 170 (Del. Ch. 2003) (citing *Mayer v. Executive Telecard, Ltd.,* 705 A.2d 220, 223 (Del. Ch.1997) ("[The] purpose [of § 145] is to encourage capable persons to serve as officers, directors, employee or agents of Delaware corporations, by assuring that their reasonable legal expenses will be paid."); *Hibbert v. Hollywood Park, Inc.,* 457 A.2d 339, 343-44 (Del.1983) (the policy of Delaware's indemnification statute is to encourage corporate officials to resist unjustified lawsuits and to encourage capable individuals to serve as corporate officials); *Scharf v. Edgcomb Corp.,*

---

the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained"). Courts have suggested that the bond requirement may be relaxed in extraordinary circumstances, but the exception is very rarely justified. *Hoxworth,* 903 F.2d at 211 n.32 (district court abused its discretion in excusing bond); *Frank's GMC Truck Ctr.,* 847 F.2d at 103 ("the instances in which a bond may not be required are so rare that the requirement is almost mandatory").

1997 WL 762656, at *4 (Del. Ch. Dec.4, 1997) ("Indemnification provisions authorized by statute and incorporated into bylaws . . . demonstrate the desire to broaden the flexibility of decision making by eliminating the chilling effect of potential personal liability on the part of officers and directors.")).

The Delaware statute, however, merely *authorizes* corporations to advance and indemnify legal expenses; it leaves to the individual corporation the decision whom to indemnify, or whether to indemnify at all. If this is a public policy, it is an optional one. The application of public policy thus comes back to the question of whether Mr. Aleynikov is an officer. Aleynikov argues that it is "in the public interest to require companies to honor their obligations, imposed under both the companies' bylaws and the applicable corporation law." That statement is plausible, but it begs the precedent question of whether the By-laws impose such an obligation. If Mr. Aleynikov is not an officer, then GS Group is not failing to honor any obligation. Further, Aleynikov appears to concede, at least for purposes of this motion, that he exercises no managerial or executive functions. If that is so, then the underlying policy rationale for indemnification and advancement—attracting capable individuals to serve, promoting risk-taking, ensuring flexibility—has far less force. The public policy factor is neutral at best.

The Plaintiff has not demonstrated a sufficient likelihood of success at this early stage, nor has he made a strong showing as to the remaining factors. For the foregoing reasons, then, the Plaintiff's application for a preliminary injunction is denied.

## V.    The Parties' Dispositive Motions

### A. Defendant's Motion to Dismiss

In order for Mr. Aleynikov's Complaint to survive Defendant's Motion to Dismiss, it must plead allegations which, if taken as true and viewed in a light most favorable to Aleynikov, set forth a claim that may entitle him to relief. This is a far lower threshold than a demonstration of likelihood of success for purposes of a preliminary injunction. *Compare* Sections II.A *and* II.B, *supra.* Is it facially plausible that a person who has the job title of "vice president" is an officer of that entity? Yes, it is plausible. And if Aleynikov's title of vice president renders him an officer for purposes of § 6.4 of the By-laws, then he is eligible for indemnification and advancement of his legal fees by GS Group. Accordingly, the Court will not dismiss Mr. Aleynikov's complaint.

### B. Cross Motions for Summary Judgment

Both parties have moved for summary judgment.

#### 1. A "Summary Proceeding"

Plaintiff urges the Court to approach this case as if it were a "summary advancement proceeding" in the Delaware Court of Chancery.[12] *See* Pl. App. & MSJ at 9-10. In such a summary proceeding, says Aleynikov, a decision can, "in most cases, be based on a review of the pleadings against [the plaintiff] in the actions for which advancement is sought." *Confederate Motors,* 859 F. Supp. 2d at 184 (internal quotations and citations omitted); *see also id.* at 188. *Accord Kaung v. Cole Nat'l Corp.,* 884 A.2d 500, 509 (Del. 2005); *Fasciana,* 829 A.2d at 167; *see also DeLucca v. KKAT Mgmt., L.L.C.,* CIV.A. 1384-N, 2006 WL 224058, *6 (Del. Ch. Jan. 23, 2006) ("Advancement cases are particularly appropriate for resolution on a paper record, as they principally involve the question of whether claims pled in a complaint against a party . . . trigger a right to advancement under the terms of a corporate instrument.").

This Court is applying Delaware substantive law. It cannot, however, consistent with the doctrine of *Erie R. Co. v. Tompkins,* 304 U.S. 64 (1938), conduct a state summary proceeding within this federal action:

> Although a district court applies the substantive law of the forum state in which it sits, it applies the federal laws governing procedure. *See Hanna v. Plumer,* 380 U.S. 460, 465-66, 85 S. Ct. 1136, 14 L.Ed.2d 8 (1965); *Hiatt v. Mazda Motor Corp.,* 75 F.3d 1252, 1255 (8th Cir.1996). The Federal Rules of Civil Procedure govern all suits of a civil nature even if the civil action has been removed to the district court from state court, Fed. R. Civ. P. 81(c), and "provide the normal course for beginning, conducting, and determining controversies." [citing *New Hampshire Fire Ins. Co. v. Scanlon,* 362 U.S. 404, 406, 80 S. Ct. 843, 4 L.Ed.2d 826 (1960)]. Since the Federal Rules of Civil Procedure govern the Court's approach, unless there is express statutory authorization, a federal court should not allow proceedings more summary than the full court trial at common law. See *id.* at 407; *see also Daly v. United States,* 393 F.2d 873, 875 (8th Cir.1968)....

*CPG Finance I, L.L.C v. Shopro, Inc.,* 2006 WL 744275 at *3 (W.D. Mo. Mar. 22, 2006). *See also Caruso v. Perlow,* 440 F. Supp. 2d 117, 118  (D. Conn. 2006) ("Plaintiff has failed to explain what federal authority exists for this Court to borrow a state statutory procedure to allow registration of state-court

---

[12]    DGCL § 145(k) provides: "The Court of Chancery is hereby vested with exclusive jurisdiction to hear and determine all actions for advancement of expenses or indemnification brought under this section or under any bylaw, agreement, vote of stockholders or disinterested directors, or otherwise. The Court of Chancery may summarily determine a corporation's obligation to advance expenses (including attorneys' fees)."

judgments in federal court ... where no civil action has ever been filed, and, indeed, where the very purpose of invoking the state statute is to take advantage of a procedural short cut to avoid the necessity of filing a suit on the judgment "); *United Mutual Houses, L.P. v. Andujar,* 230 F. Supp. 2d 349, 354 (S.D.N.Y. 2002) (barring removal to federal court of a state tenant holdover proceeding, because, *inter alia,* "absent express authorization by statute, federal courts cannot entertain summary proceedings"); *Glen 6 Assoc., Inc. v. Dedaj,* 770 F. Supp. 225, 227–28 (S.D.N.Y.1991) ("It is obvious that a summary process and a plenary civil trial, shaped by the federal rules, are very different. In light of *Hanna v. Plumer* and progeny, unless there is express statutory authorization or compelling reasons, a federal court cannot allow proceedings more summary than the full court trial at common law.") (internal citations omitted).[13]

At any rate, adoption of the "summary advancement proceeding" procedure would not necessarily help Plaintiff. This case does not fit into the analytical mold of a typical, easily-resolved summary advancement proceeding, for two reasons.

First, the cases stating that advancement and indemnity can ordinarily be decided on the pleadings were deciding a different issue. Those courts were not resolving a dispute (like this one) over whether the *plaintiff* was eligible.[14] Rather, they were assessing whether the particular *claims* pled against plaintiff triggered the right to advancement. In *Fasciana* and *Confederate,* the question before the court was "whether the plaintiff seeking advancement is facing claims that are subject to his advancement right...." *Fasciana,* 829 A.2d at 16; *see Confederate Motors,* 859 F. Supp. 2d at 184. Similarly, in *DeLucca,* the question was whether the plaintiff faced claims that would "trigger a right to advancement." 2006 WL 224058, *6. The material question here cannot be resolved with reference to pleadings. I must first determine whether Aleynikov is an officer who *possesses* an advancement/indemnity right before I reach the easier issue of whether that right was triggered by the claims asserted against him.

Second, the issue in those cases lent itself to resolution based on the factual record developed in the underlying litigation. A court seeking merely to determine the nature of the claims asserted against a person would naturally

---

[13]    Federal law provides for summary proceedings under limited circumstances. *See, e.g.,* Fed. R. Civ. P. 65.1 (proceeding against surety on a bond). Plaintiff does not invoke any such federal procedure.

[14]    The plaintiff's eligibility status was not realistically in dispute in those cases. *See, e.g., DeLucca,* 2006 WL 224058 at *8-9 (Defendant's claim that officer was not an indemnified person was "frivolous" based on the facts alleged against her in defendant's complaint); *Confederate Motors,* 859 F. Supp. 2d at 189 ("there is sufficient evidence that Terny served as director of Confederate to allow him to seek an advancement of expenses.").

24

need to look no farther than the pleadings. *See Fasciana,* 829 A.2d at 167 (Court reached decision "by reference to the undisputed terms of the indictment in the Criminal Action, and the complaint in the Civil Action, as well as by reference to certain other undisputed exhibits."); *Reddy v. Elec. Data Sys. Corp.,* CIV.A. 19467, 2002 WL 1358761, *3 (Del. Ch. June 18, 2002) (parties agreed that Court could consider "the indictment in the Criminal Action and the amended complaint in the EDS Action" which provided the "foundation" for the Court's ruling); *Confederate Motors,* 859 F. Supp. 2d at 184 (determination based "on a review of the pleadings against [the plaintiff] in the actions for which advancement is sought."); *Weinstock v. Lazard Debt Recovery GP, LLC,* CIV.A. 20048, 2003 WL 21843254 (Del. Ch. Aug. 8, 2003) (same).

In addition, these summary advancement proceedings often involve underlying claims that arise directly from the individuals' alleged abuse of their corporate capacities or fiduciary positions. *See DeLucca,* 2006 WL 224058 at *1 (the "typical corporate advancement case" involves "persons who are sued by reason of the fact that they took action in a specified corporate capacity"). Thus the record of the underlying case may collapse the "status" and "claim" issues, establish authoritatively the nature of plaintiff's position, and foreclose any realistic dispute over his or her eligibility. Where the underlying claim is that the plaintiff abused a fiduciary position, the pleadings would naturally establish what that position was. The underlying charges against Mr. Aleynikov, by contrast, do not involve allegations that he breached his fiduciary duty or otherwise abused a position of corporate power. Thus the pleadings and evidence in the underlying criminal case might or might not establish whether he was an "officer" for purposes of the By-laws. [15]

For sure, a summary proceeding may require the court to "act in the face of some factual uncertainty." *Fasciana,* 829 A.2d at 167. But even if that state procedure applied here, the Court would find that it is faced, not with "some"

---

[15]     The Court does not assess the merits of the New York charges, but considers them to determine whether they would shed any light on the question of whether Mr. Aleynikov is an officer of GSCo.

As to the federal criminal case, GS Group does not appear to dispute that *if* Mr. Aleynikov were an officer of GSCo he would be entitled to indemnification for costs and fees. *See Perconti v. Thornton Oil Corp.,* CIV.A. 18630-NC, 2002 WL 982419 (Del. Ch. May 3, 2002) ("Section 145(c) assures indemnification to the corporate officer who has been 'successful' in the criminal proceeding. It does not require a determination that the corporate officer was 'innocent.'"); *Stockman v. Heartland Indus. Partners, L.P.,* CIV.A. 4227-VCS, 2009 WL 2096213, *10 (Del. Ch. July 14, 2009) ("An indemnitee in a criminal proceeding is successful any time she avoids conviction: '[s]uccess is vindication ... any result other than conviction must be considered success.'") (quoting *Merritt-Chapman & Scott Corp. v. Wolfson,* 321 A.2d 138, 141 (Del. Super. 1974)).

uncertainty, but with material factual uncertainty that cannot be resolved by the current record.

I move on to consideration of summary judgment, pursuant to Fed. R. Civ. P. 56.

## 2. Summary Judgment

The often-cited summary judgment standard—"no genuine dispute as to any material fact"—actually sheds little light on what constitutes a "genuine dispute." The Supreme Court explained in *Anderson v. Liberty Lobby* that a genuine dispute exists where the moving party's submission does not foreclose "the possibility of certain facts from which it would be open to a jury to infer from the circumstances" that the dispute should be resolved in favor of the nonmoving party. *Anderson*, 477 U.S. at 249 (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158-159 (1970)). Accordingly, Plaintiff's submissions on his motion must foreclose the possibility that a reasonable jury could find that Aleynikov was *not* an officer of GSCo. For Defendant the converse is true: its submissions must foreclose the possibility that a reasonable jury could find that Aleynikov's position as vice president *was* that of an officer of GSCo.

As the Supreme Court instructed in *Celotex Corp. v. Catrett,* "the plain language of Rule 56(c) mandates the entry of summary judgment, *after adequate time for discovery* and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." 477 U.S. 317, 322 (1986) (emphasis added).  Here, both parties have had ample opportunity to argue their respective positions, but nonetheless have failed to make the requisite showing. That is likely an indication, in this Court's view, that there has not been "adequate time for discovery"–indeed there has been none at all–and that some discovery will be necessary before the dispute can be resolved.

As discussed in more detail above (*see* Section IV.A), the Court finds deficiencies in both sides' arguments that may well be attributable to an undeveloped factual record. Specifically, while Defendant has submitted several affidavits, their content is superficial, leaving the Court with a litany of questions about the status of officers of GSCo. For example, Defendant urges the Court to rely on GSCo's Partnership Agreement as the defining document on the "officer" question. But a plain reading of that document does not yield any explicit definition of GSCo's officers. Defendant submits an affidavit outlining an established appointment procedure by which officers may be identified. But the content is general and unsupported by documentation, and Plaintiff has not had the opportunity to conduct discovery to probe these assertions. MTB, to take a contrary example, buttresses its argument with repeated references to Mr. Aleynikov's "expectations" with regard to his appointment as vice president. There is no affidavit, however, establishing what those expectations were; nor has Aleynikov submitted an employment contract

or any other documentary evidence tending to establish any expectation beyond what is in the By-laws. Aleynikov is adamant that a functional analysis of his role at GSCo is irrelevant, and he disclaims reliance on the "functional" definition in Section 6.4; nevertheless, such evidence may be relevant. In short, both sides need to dig deeper before this case will be poised for resolution.

Faced with a similar (though concededly not identical) set of circumstances, the United States District Court for the Middle District of Pennsylvania took a similar approach. In *Hecht v. Babyage.com*, plaintiff claimed he was hired as Chief Technology Officer of BabyAge and therefore was entitled to indemnification and advancement pursuant to BabyAge's bylaws. Defendant insisted that plaintiff was never truly an officer, but instead was a "consultant," and that it was in that capacity that he wrote and maintained the company's software and fulfillment system. The Court denied plaintiff's application for a preliminary injunction and ordered discovery, because it found that it did not have sufficient evidence to resolve the question of plaintiff's eligibility:

> The disagreement here between the parties is largely over plaintiff's position within the company. Defendant insists that [plaintiff] was never an officer or director, while plaintiff contends that he was informed he occupied an officer's position and that he received business cards and other indications of his status. Resolving this question appears central not only to plaintiff's motion for a preliminary injunction, but also to plaintiff's claims against the defendant for breach of fiduciary duty. Without more evidence obtained through the discovery process, the court cannot determine whether plaintiff was an officer eligible for indemnity.

*Hecht v. Babyage.com*, 3:10 CV 724, 2010 WL 3896194, *4 (M.D. Pa. Sept. 30, 2010)

The same is true here. Summary judgment presupposes that there has been "adequate time for discovery." *Celotex*, 477 U.S. at 322. "Without more evidence obtained through the discovery process," *see Babyage.com, supra*, this Court cannot determine whether Mr. Aleynikov is a member of the class of persons eligible for advancement and indemnification.

## VI.    CONCLUSION

The Court finds that Mr. Aleynikov's entitlement to relief turns on factual questions that require further exploration before either side is granted relief – whether provisional, summary or final. Although sympathetic to Mr. Aleynikov's (and counsel's) situation, I find myself unable at present to order the requested relief. The Court will, however, authorize an expedited discovery

schedule, which the parties may work out by consent or in consultation with Magistrate Judge Hammer, at the conclusion of which either side or both may wish to renew their motions for summary judgment.

For the reasons stated above, Plaintiff's Application for a Preliminary Injunction and his Motion for Summary Judgment are **DENIED**. Defendant's Motion to Dismiss, or, in the alternative, for Summary Judgment is also **DENIED**. An appropriate order follows.

KEVIN MCNULTY
United States District Judge

Dated: December 14, 2012

28