## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

---

**SERGEY ALEYNIKOV,**

**Plaintiff,**

**v.**

**THE GOLDMAN SACHS GROUP, INC.,**

**Defendant.**

Civ. No. 12-5994 (KM)

**[REDACTED]
OPINION**

---

**KEVIN MCNULTY, U.S.D.J.:**

    This matter comes to court on a renewed motion for summary judgment (ECF 130) brought by the plaintiff, Sergey Aleynikov, against defendant Goldman Sachs Group, Inc. ("GS Group"), the parent company of his former employer, Goldman, Sachs & Co. ("GSCo"). Also before the court is a cross motion by GS Group and GSCo (together, "Goldman")[1] for summary judgment (ECF 143). This opinion should be read in conjunction with my prior opinion in this case, dated December 14, 2012 (ECF No. 44), which established the legal and procedural context for this renewed motion and cross motion.

    Aleynikov seeks indemnification for legal fees and expenses he has already incurred in a federal criminal case that concluded, after appeal, in dismissal of the charges (the "Federal Case," 10 Cr 0096 (S.D.N.Y.)). He also seeks advancement of legal fees and expenses for his ongoing defense of a criminal case thereafter filed in New York state court based on the same facts (the "State Case," People v. Aleynikov, Indictment No. 4447/12). There is a fundamental distinction between indemnification and advancement. Indemnification is a claim for fees incurred in a case that has already concluded in plaintiff's favor; it is a claim for damages based on events concluded in the past. Advancement of fees, on the other hand, is designed to

---

[1]    Goldman, Sachs & Co. joined GS Group's Counterclaims as a Counterclaim Plaintiff. Aleynikov repeatedly has pointed out that GSCo joined the action without leave of court. That defect is acknowledged, but it is easily remedied and, for purposes of my decision here, irrelevant.

fund an ongoing case, and the recipient of the funds is required to pay them back should he be unsuccessful in that case.

For the reasons expressed below, I will grant Aleynikov's motion for summary judgment with respect to his claim for advancement of fees only. Defendants shall pay to Aleynikov's counsel, Marino Tortorella & Boyle, P.C. ("MTB"), (1) reasonable fees and expenses incurred to date for Aleynikov's legal defense in the State Case; (2) reasonable fees and expenses that Aleynikov incurs for his ongoing defense in the State Case, on a rolling basis until a final judgment is reached; and (3) "fees on fees," *i.e.,* fees and expenses in this action that can reasonably be apportioned and attributed to the issue of advancement.

As to indemnification, summary judgment is denied. I deny the motion in part because any dollar amount due has not yet been proven; issues as to, for example, MTB's fee arrangements with Aleynikov in the federal criminal case may require exploration. But I am primarily motivated by concerns of procedural fairness. In December 2012 I denied Aleynikov's motions for summary judgment and a preliminary injunction. I did, however, order expedited discovery, based primarily on my perception that the advancement claim should be explored as quickly as possible. Advancement is both time-sensitive (the funds are needed in pending legal proceedings now) and provisional (the funds must be paid back if plaintiff is not successful). As to indemnification, however, neither is true. It follows that, as to indemnification, Aleynikov should not reap an advantage from what amounted to a limited priority in discovery. Goldman has had little or no opportunity for discovery on the counterclaims it filed shortly after my earlier ruling. Thus, even if I were to grant summary judgment on indemnification, I would stay that part of my judgment. Goldman should have the opportunity to litigate its counterclaims, which might substantially offset any amounts found owing on Aleynikov's indemnification claim. When both sides' remaining claims are ripe, I will entertain motions for summary judgment or try them, as appropriate.[2]

---

[2]     In the interim the parties may, through discovery, fill in whatever gaps remain in the indemnification issues. For example, Goldman's counsel referred at oral argument to the need to explore MTB's fee arrangements with Aleynikov in connection with the Federal Case. Whether or not that concern is valid, it is certainly true that discovery to date has been expedited, has been most urgently directed to the advancement issue, and may have been incomplete as to indemnification.

## I.    Procedural Background

Aleynikov initially filed a complaint and petition for a preliminary injunction, as well as a motion for summary judgment, seeking

> (1) indemnification for legal costs and fees arising from his successful defense of the Federal Case, in which it was alleged that, while employed as a vice president at GSCo, Mr. Aleynikov stole proprietary computer source code;

> (2) advancement of legal costs and fees for his defense of the State Case, which was filed after the dismissal of the Federal Case and arose from the same factual allegations; and

> (3) advancement of attorneys' fees and expenses incurred in this civil action seeking indemnification and advancement ("fees on fees").

*See* Motion for Summary Judgment by Sergey Aleynikov, Sep. 25, 2012, ECF No. 2 ("Pl. 1st MSJ") and Order to Show Cause for a Preliminary Injunction, Sep. 25, 2012, ECF No. 4 ("Pet. PI"). GS Group moved to dismiss Aleynikov's Complaint, opposed the preliminary injunction motion, and, in the alternative, sought summary judgment. *See* Def.'s Mem. in Resp. to Order to Show Cause and Opp. to Pl.'s Mot. Summ. J. and in Support of Def.'s Mot. to Dismiss or for Summ. J., Oct. 12, 2012, ECF No. 22 ("Def. Opp. & MSJ").

After briefing and oral argument, this Court denied Aleynikov's petition for a preliminary injunction and denied both parties' dispositive motions. *See* Opinion of Dec. 14, 2012, ECF No. 44 (Dec. Op.). In short, I held that the record was undeveloped with regard to an essential issue: Was Aleynikov an "officer" of GSCo, and therefore eligible for indemnification and advancement of legal fees? *See* Dec. Op. at 2. I ordered expedited discovery. *See id.* at 27-28.

Just a week later, on December 21, 2012, GS Group and GSCo[3] answered Aleynikov's Complaint and filed counterclaims against him, based on Aleynikov's alleged theft of Goldman's valuable computer code. The counterclaims allege breach of contract, misappropriation of trade secrets, and conversion. Goldman also seeks a declaratory judgment that it would have no liability to Aleynikov for malicious prosecution. *See* Answer & Counterclaims, December 21, 2012, ECF No. 51 ("Counterclaims"). Aleynikov moved to dismiss those Counterclaims. *See* Motion to Dismiss the Counterclaim by Sergey Aleynikov, January 11, 2013, ECF No. 62 ("MTD Counterclaim").

---

[3]    As noted above, at n. 1, I refer to these two entities collectively as "Goldman."

Months of discovery and discovery disputes ensued. Goldman urged that expedited discovery commence only after its counterclaims had been properly joined. That procedure, said Goldman, would permit all claims to be explored together in discovery. Def. Letter of December 19, 2012, ECF No. 47. The Court, however, maintained its original course, limiting the scope of discovery to "the issues identified in the District Court's December 14, 2012, Opinion and Order," and set a discovery schedule to be completed by March 1, 2013. *See* Discovery Order of Magistrate Judge Hammer, December 21, 2012, ECF No. 52 ("Dec. 21, 2012 Disc. Or."). This had the effect of permitting discovery to go forward on Aleynikov's claims—especially the advancement claim—while delaying it as to other issues.

Aleynikov took the depositions of Adam Schlesinger ("Schlesinger"), Aleynikov's former supervisor, *see* Certification of Kevin H. Marino in Support of Plaintiff's Motion for Summary Judgment, July 24, 2013, ECF No. 133 ("Marino Cert."), Ex. 6; Gregory K. Palm ("Palm"), GS Group's General Counsel, *id.* Ex. 7; and Matthew E. Tropp ("Tropp"), GSCo's Associate General Counsel, *id.* Ex. 8. After completing those initial depositions, Aleynikov sought to depose GS Group and GSCo via two representatives designated pursuant to Fed. R. Civ. P. 30(b)(6).[4] Norman Feit ("Feit"), Director of Litigation and Regulatory Proceedings, and a Managing Director of GSCo, was deposed as GSCo's representative on the topic of the payment of legal fees and expenses to non-clerical employees. *See id.* Ex. 10. Tropp was deposed as the representative on the topic of the term "officer" as used in GS Group's By-Laws. *Id.* Ex. 11. GS Group was permitted to depose Aleynikov on the limited issue of his employment status and the basis for his belief that he was an officer of GSCo. *See id.* Ex. 9. In addition, both sides were permitted ten interrogatories, ten document production demands, and ten requests to admit. *See* Dec. 21, 2012 Disc. Or.; Marino Cert., Exs. 18 & 19; Declaration of Melissa A. Salimbene in Opposition to Aleynikov's Motion for Summary Judgment, August 7, 2013, ECF No. 149 ("Salimbene Decl."), Exs. 8, 19, 21, 30, 33.

---

[4]   ***"Notice or Subpoena Directed to an Organization.*** ... The named organization must then designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on its behalf; and it may set out the matters on which each person designated will testify. ... The persons designated must testify about information known or reasonably available to the organization." Fed. R. Civ. P. 30(b)(6).

On July 24, 2013, Aleynikov filed the renewed Motion for Summary Judgment that is now before the Court. *See* Motion for Summary Judgment by Sergey Aleynikov, July 24, 2013, ECF No. 130 ("Pl. Renewed MSJ"). Goldman opposes the motion and has cross-moved for summary judgment. *See* Cross-Motion for Summary Judgment by the Goldman Sachs Group, Inc., August 7, 2013, ECF No. 143 ("Def. Renewed Opp. & MSJ"). I heard oral argument on August 21, 2013.

## II.   Legal Background: Summary Judgment Standards and the December 2012 Opinion

### A. Cross-Motions for Summary Judgment

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (summary judgment is appropriate where "there is no genuine issue of any material fact and the moving party is entitled to a judgment as a matter of law."); *Alcoa, Inc. v. United States*, 509 F.3d 173, 175 (3d Cir. 2007). Summary judgment is desirable because it eliminates unfounded claims without resort to a costly and lengthy trial, *Celotex*, 477 U.S. at 327, but a court should grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Id.* at 322 (citing Fed. R. Civ. P. 56(c)). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The burden of showing that no genuine issue of material fact exists rests initially on the moving party. *Celotex*, 477 U.S. at 323. Once the moving party has made a properly supported motion for summary judgment, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 247-48 (citing Fed. R. Civ. P. 56(e)). In evaluating a summary judgment motion, a court must view all evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976).

Of course an issue cannot be "material" and judgment cannot be required "as a matter of law" except in relation to the substantive law governing a claim. *See* Fed. R. Civ. P. 56. In this diversity case, that substantive law is Delaware state law.

B.  Indemnity, Advancement and "Officer" Status: The Court's December 2012 Opinion

The parties agree that the availability of advancement or indemnity depends heavily on one disputed issue: whether Aleynikov was an "officer" of GSCo within the meaning of Section 6.4 of the GS Group By-laws. I assume familiarity with the Court's Opinion of December 14, 2012, but will recap briefly here.[5]

———————————————

[5]      Here is some of the critical (and essentially undisputed) factual and procedural background:

GSCo is a "broker-dealer" limited liability partnership organized under the laws of New York State. It is a non-corporate subsidiary of GS Group, the Goldman Sachs parent company, which is incorporated in the State of Delaware.

Mr. Aleynikov was employed by GSCo from May 7, 2007 through June 30, 2009 (his last day in the office was June 5). There he was part of a team of computer programmers responsible for developing source code relating to GSCo's high frequency trading system. During his employment at GSCo, Aleynikov held the title of "vice president."

In April 2009, Mr. Aleynikov accepted an employment offer from Teza Technologies, a start-up company based in Chicago. Before leaving GSCo in June, Aleynikov allegedly copied and transmitted to his home computer and other devices, via a server in Germany, hundreds of thousands of lines of confidential source code. About a month later, Aleynikov flew to Teva's offices carrying a laptop and flash drive that allegedly contained the stolen source code. Immediately upon his return, he was arrested by the FBI at Newark Liberty International Airport and charged federally.

After an eight day jury trial in the United States District Court for the Southern District of New York, Mr. Aleynikov was convicted of (1) theft of trade secrets in violation of the Electronic Espionage Act ("EEA") (18 U.S.C. § 1832(a)(2) and (4)), and (2) transportation of stolen property in interstate commerce in violation of the National Stolen Property Act ("NSPA") (18 U.S.C. § 2314). ECF 1 ("Compl."), ¶¶ 20-21; s*ee also United States v. Aleynikov*, 737 F. Supp. 2d 173 (S.D.N.Y. 2010). On March 18, 2011, Aleynikov was sentenced to 97 months of imprisonment. Compl. ¶ 22. On direct appeal, the United States Court of Appeals for the Second Circuit reversed the decision of the district court, reasoning that, while Aleynikov breached his confidentiality obligations to Goldman, his

6

As stated in that Opinion, the starting point is Section 145 of the Delaware General Corporation Law ("DGCL"). Delaware corporate law authorizes *indemnification* of legal expenses when the person has been successful in the underlying proceeding. "Section 145(a) and (b) of the Delaware General Corporation Law gives corporations the power to indemnify their current and former corporate officials from expenses incurred in legal proceedings '*by reason of the fact* that the person is or was a director, officer employee or agent of the corporation'." *Homestore, Inc. v. Tafeen*, 888 A.2d 204, 211 (Del. 2005) (quoting Del. Code Ann. tit. 8, § 145(a) & (b)). Indemnification is not appropriate "until after the defense to legal proceedings has been successful on the merits or otherwise." *Id.*

In addition, DGCL Section 145(e)[6] authorizes the *advancement* of expenses being incurred in pending proceedings. Its aim is to provide

---

conduct did not fall within the scope of the charged federal offenses. *See United States v. Aleynikov*, 676 F. 3d 71 (2d Cir. 2012). Accordingly, a Judgment of Acquittal on both counts was entered on June 5, 2012. Compl. Ex. B. Shortly thereafter, on August 2, 2012, Aleynikov was rearrested in New Jersey and then indicted by a Manhattan Grand Jury on two counts of "Unlawful use of Secret Scientific Material," in violation of NY Penal Law § 165.07, and one count of "Unlawful Duplication of Computer Related Material," in violation of NY Penal Law § 156.30(1). *See* Marino Cert., Ex. 4.

    Mr. Aleynikov has been represented by the New Jersey law firm of Marino, Tortorella & Boyle ("MTB") since April 2010. According to the Complaint, Aleynikov was "rendered impecunious" after paying about a quarter of the legal fees incurred during his defense of the federal charges.

Dec. Op. at 3-4.

[6]     (e) Expenses (including attorneys' fees) incurred by an officer or director of the corporation in defending any civil, criminal, administrative or investigative action, suit or proceeding may be paid by the corporation in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of such director or officer to repay such amount if it shall ultimately be determined that such person is not entitled to be indemnified by the corporation as authorized in this section. Such expenses (including attorneys' fees) incurred by former directors and officers or other employees and agents of the corporation or by persons serving at the request of the corporation as directors, officers, employees or agents of another corporation, partnership, joint venture, trust or other enterprise may be so paid upon such terms and conditions, if any, as the corporation deems appropriate.

Del. Code Ann. tit. 8, § 145(e) (West 2012).

"immediate interim relief from the personal out-of-pocket financial burden of paying the significant on-going expenses inevitably involved with investigations and legal proceedings." *Id.* at 211 (internal quotation omitted).

The right to indemnification and the right to advancement are "separate and distinct." Indemnification depends upon whether the officer's defense in underlying litigation has succeeded. Advancement, by contrast, depends on the pendency, not the merits, of the claims asserted against the corporate official. *See Ridder v. CityFed Fin. Corp.*, 47 F.3d 85, 87 (3d Cir. 1995) ("Under Delaware law, appellants' right to receive the costs of defense in advance does not depend upon the merits of the claims asserted against them, and is separate and distinct from any right of indemnification they may later be able to establish.").

The December 2012 Opinion analyzed the extent to which Goldman, in its By-Laws, implemented the authority granted by the Delaware General Corporation Law. Section 6.4 of GS Group's By-laws provides for indemnity and advancement of legal fees as follows:

> The Corporation shall indemnify to the full extent permitted by law any person made or threatened to be made a party to any action, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of the fact that such person or such person's testator or intestate is or was a director or officer of the Corporation, is or was a director, officer, trustee, member, stockholder, partner, incorporator or liquidator of a Subsidiary of the Corporation . . . . Expenses, including attorneys' fees, incurred by any such person in defending any such action, suit or proceeding shall be paid or reimbursed by the Corporation promptly upon demand by such person and, if any such demand is made in advance of the final disposition of any such action, suit or proceeding, promptly upon receipt by the Corporation of an undertaking of such person to repay such expenses if it shall ultimately be determined that such person is not entitled to be indemnified by the Corporation. The rights provided to any person by this by-law shall be enforceable against the Corporation by such person, who shall be presumed to have relied upon it in serving or continuing to serve as a director or officer or in such other capacity as provided above.

Salimbene Decl., Ex. 1 ("By-Laws") § 6.4.

8

Thus, if certain conditions are met, indemnification and advancement are mandatory. By-laws § 6.4 ("*shall* be paid or reimbursed by the Corporation"). The By-Laws do, however, restrict indemnification and advancement to particular persons, including "officers," a defined term:

.... the term "officer,"
[1] when used with respect to the Corporation, shall refer to any officer elected by or appointed pursuant to authority granted by the Board of Directors of the Corporation pursuant to clauses (i), (ii), (iii) and (iv) of Section 4.1 of these by-laws,
[2] when used with respect to a Subsidiary or other enterprise that is a corporation, shall refer to any person elected or appointed pursuant to the by-laws of such Subsidiary or other enterprise or chosen in such a manner as is prescribed by the by-laws of such subsidiary or other enterprise or determined by the board of directors of such Subsidiary or other enterprise, and
[3] when used with respect to a Subsidiary or other enterprise that is not a corporation or is organized in a foreign jurisdiction, the term "officer" shall include in addition to any officer of such entity, any person serving in a similar capacity or as the manager of such entity     .          .          .          .

(By-Laws § 6.4; numbering of categories [1], [2] and [3] and line breaks added for ease of reference.)

GSCo, a New York limited liability partnership,[7] is "a Subsidiary or other enterprise that is not a corporation" and it therefore falls within By-laws Section 6.4 Category [3], quoted above. Under Section 6.4[3], an "officer" is defined as "any officer of such entity, [and] any person serving in a similar capacity or as the manager of such entity." Aleynikov does not claim that he served "in a similar capacity" to an officer or that he served as "manager" of GSCo. Rather, Aleynikov claims to be an "officer" of GSCo because he held the title of "vice president."

As I observed ten months ago, "the phrasing of Category [3] is less than clear. It begins by stating that 'the term 'officer' shall include in addition to any officer of such entity....' Thus, for a non-corporate subsidiary, an 'officer' is defined as, *inter alia,* 'any officer.'" Dec. Op. at 12.

---

[7]     Sometimes GSCo is referred to in the papers as a limited partnership. I take this to be a shorthand reference, but in any event the distinction is not material to the issues here.

In discussing this issue the first time around, I reasoned:

A "vice president"—Aleynikov indisputably held that title—would ordinarily be considered an "officer" in a corporate context. In a non-corporate partnership entity like GSCo, however, "officer" and "vice president" have no fixed definition. Moreover, it does not appear that Aleynikov, a computer programmer, performed functions normally associated with the status of officer or manager. The definition of a non-corporate "officer" in GS Group's By-laws is circular and unhelpful. Aleynikov argues that I should therefore let the burden of ambiguity fall on GS Group, take the title of "vice president" at face value, and declare him eligible for advancement of fees. GS Group urges, however, that "vice president" can be something of a courtesy title in its industry. It further alleges that it has established a process of appointment that clearly distinguishes between officers and non-officers. If true, this would be highly relevant; an entity may decide whom to designate as an officer. But because GS Group points to no such written policy, because it is in possession of all the facts on this point, and because there has been no discovery, it would be unfair to conclude from a blanket statement in an affidavit that it is true. Aleynikov is entitled to probe these matters.

Dec. Op. at 2.

I stated then that the day might come when I would have to rely on *contra proferentem,* and construe the By-Laws against their drafter, Goldman.[8] In the meantime, however, I ordered expedited discovery. Such discovery was intended to establish whether there was somewhere, for example, a stated definition of the term "officer" as used in By-Laws § 6.4[3], or a pattern of indemnifying GSCo employees that would suggest such a definition.

---

[8] "Plaintiff suggests that if the Court finds the GS Group's By-laws to be ambiguous, it should employ the interpretive principle of *contra proferentem,* 'which is that ambiguities in a contract should be construed against the drafter.' ... [T]he answer to this question of contract interpretation may turn on matters of fact that cannot be resolved on the present record. At some point the Court may have to employ interpretive tools of 'last resort,' but to do so at this stage would be premature."

Dec. Op. at 17.

### III.   Discussion

Despite a more developed factual record, a renewed round of briefing, and helpful oral advocacy from both sides, I still find this to be a close question. I do resolve the advancement issue in Aleynikov's favor. My decision, as foreshadowed in the December 2012 Opinion, largely concerns the issue of whether Aleynikov, as a vice president of GSCo, is an "officer" for purposes of By-Laws § 6.4[3]. The following discussion has several interrelated components.

First, I read the By-Laws in keeping with the Delaware state law policy favoring advancement of fees, a remedy that is intended to be emergent and provisional. Delaware case law confirms my conclusion that by-laws are to be read liberally to effectuate that policy. (Section 3.A, *infra*.)

Second, I consider certain parol evidence that has emerged from discovery. (Section III.B, *infra*) In the end, parol evidence may not be central to the legal issues, but I consider it to the extent it may shed light on ambiguities in the By-Laws or interpretive issues. GSCo has submitted evidence that it appoints officers by resolution. For purposes of this motion I give that evidence full credence, but I note that Goldman itself acknowledges that this procedure is independent of the By-Laws. It therefore sheds little light on the interpretation of § 6.4[3]. Aleynikov submits evidence that Goldman has paid the legal fees of 51 of 53 persons who sought them, including 15 who, like him, were vice presidents. Goldman's insistence that it elects to make such decisions on a discretionary basis, even given due credit, at best neutralizes this evidence as a guide to the scope of mandatory indemnification under By-Laws § 6.4[3]. Goldman's evidence of title inflation, too, does not bar summary judgment, particularly if the burden of any resulting uncertainty rightly falls on Goldman.

Third, I consider the record in light of Delaware law. (Section III.C., *infra*.) Delaware interprets potential ambiguities in by-laws under ordinary rules of construction of contracts. Plain language, supplemented by case law interpretations, suggests that a vice president be considered an officer. Further, Delaware will not consider extrinsic evidence when the instrument in question is a business entity's constitutive charter, for example, a partnership agreement. Where, in particular, the clause in question is an advancement

11

provision, a court will tolerate some ambiguity, and will not resort to parol evidence. (Section III.C.1, *infra*.)

Fourth—and perhaps most important—is the special status of the Delaware *contra proferentem* rule with respect to corporate bylaws. Where a person has joined a business organization, and has had no opportunity to participate in the drafting of its constitutive documents, ambiguities will not merely be tolerated, but will affirmatively be interpreted against the drafter. In such a case, a dispositive order following motion practice may be appropriate even when an advancement or indemnification provision in a bylaw or partnership agreement is ambiguous. Under this robust doctrine, even assuming *arguendo* that Goldman has raised issues of fact, those issues cease to be material ones for purposes of summary judgment. (Section III.C.2, *infra*.)

Finally, I deal with the remaining, less controversial elements of an advancement claim, award partial summary judgment to Aleynikov, and fashion procedures to govern the relief awarded.

A.   <u>The pro-advancement policy of DGCL Section 145 and the emergent, provisional advancement remedy</u>

I read Goldman's By-Laws and analyze this summary judgment motion in light of Delaware's strong statutory policy favoring advancement of fees and expenses. That policy is expressed in an advancement remedy that is both emergent and provisional. Immediate advancement of fees is required, subject only to an unsecured undertaking to repay them if the applicant is unsuccessful in the underlying litigation. That statutory policy suggests that the By-Laws should be read liberally and expansively.

The public policy served by authorizing the advancement and indemnification of litigation expenses is well-settled. Without it, corporations would find it difficult to retain high-quality directors and officers, willing to make socially useful decisions that involve economic risk. By authorizing indemnity and advancement within certain guidelines, the General Assembly sought to encourage well-qualified persons to serve as directors and officers of Delaware corporations and, in that capacity, to be willing to commit their corporations, after the exercise of good faith and care, to risky transactions that promise a lucrative economic return. *Fasciana v. Elec. Data Sys. Corp.*, 829 A.2d 160, 170 (Del. Ch. 2003) (citing *Mayer v. Executive Telecard, Ltd.*, 705 A.2d 220, 223 (Del. Ch. 1997) ("[The] purpose [of § 145] is to encourage capable

persons to serve as officers, directors, employee or agents of Delaware corporations, by assuring that their reasonable legal expenses will be paid."); *Hibbert v. Hollywood Park, Inc.*, 457 A.2d 339, 343–44 (Del. 1983) (the policy of Delaware's indemnification statute is to encourage corporate officials to resist unjustified lawsuits and to encourage capable individuals to serve as corporate officials); *Scharf v. Edgcomb Corp.*, No. 15224, 1997 WL 762656, at *4 (Del. Ch. Dec. 4, 1997) ("Indemnification provisions authorized by statute and incorporated into bylaws . . . demonstrate the desire to broaden the flexibility of decision making by eliminating the chilling effect of potential personal liability on the part of officers and directors.")).

That statutory policy, liberal enough as to indemnification, is particularly liberal as to advancement.

> [DGCL] *Section 145(e)*, however, expressly contemplates that corporations may confer a right to advancement that is *greater* than the right to indemnification and recognizes that advances must be repaid if it is ultimately determined that the corporate official is not entitled to be indemnified.

*Homestore*, 888 A.2d at 212–13.

Of course, as stated in the December 2012 Opinion, the statute grants a corporation the option to advance fees and expenses; it does not require the corporation to do so. I also observed that Aleynikov did not possess any particular high-level decision-making authority.[9] Nevertheless, with those caveats, I find that the statute does strongly favor advancement, even in doubtful cases. The By-Laws grant advancement "to the full extent permitted by law," and therefore must be read, at least in a general way, as implementing the policy of the Delaware statute.

The strength of the statutory pro-advancement policy is confirmed by the emergent and provisional nature of the advancement remedy. Both the statute and the By-Laws require immediate assistance with legal expenses, reserving the company's right to repayment once litigation has ended.

It is not much of an exaggeration to say that the statue and By-Laws require immediate assistance, postponing the issue of whether such assistance

---

[9]   For those reasons, I found the public policy factor to be neutral for purposes of the preliminary injunction application, particularly because there had been no discovery as to the "officer" issue.

13

is deserved. They do not distinguish between "worthy" and "unworthy" recipients. They do not distinguish between claims brought by Goldman and claims brought by outsiders. *See* By-Laws § 6.4 (advancement is available in any proceeding brought "by reason of the fact" that a person is an officer of the company); *see also* DGCL § 145(e) (advancement of expenses of "defending any civil, criminal, administrative or investigative action, suit or proceeding"). In contrast to indemnification, which is reserved for persons who prevail in the underlying case, advancement is indifferent as to the underlying merits. Thus the Court is not to predict, or base its decision on, the likelihood of Aleynikov's prevailing in the New York criminal case. *See Homestore*, 888 A.2d at 214 ("The limited and narrow focus of an advancement proceeding precludes litigation of the merits of entitlement to indemnification for defending oneself in the underlying proceedings."); *see also Ridder*, 47 F.3d 85. In short, the advancement provision almost explicitly prioritizes speed over accuracy.

To put it another way, the statute and By-Laws contemplate that funds may be advanced to persons who in the end may not to be entitled to keep them—most commonly, perhaps, because such persons ultimately are convicted in the underlying criminal case or lose the underlying civil litigation. Of course, the advancement remedy has a backstop. It is provisional to the extent that a person who receives advancement of fees must furnish an "undertaking" to pay them back if he or she is unsuccessful in the underlying litigation. But an "undertaking," the parties agree, is nothing more than a promise; no further security is required.

The lesson to be drawn is that advancement is urgent; the applicant's defense is to be funded now, while the action is pending. Otherwise, the parties might just as well await the outcome and seek indemnification. An award of advancement, if not expeditious, may be valueless. *See United States v. Stein*, 452 F. Supp. 2d 230, 270 (S.D.N.Y. 2006) ("there is a strong public interest in the timely resolution of any disputes concerning advancement of defense costs") (vacated on other grounds). Accordingly, the statute contemplates a truncated proceeding, ordinarily on a paper record. *See DeLucca v. KKAT Mgmt., L.L.C.*, No. Civ.A. 1384-N, 2006 WL 224058 at *6 (Del. Ch. Jan. 23, 2006) ("Advancement cases are particularly appropriate for resolution on a paper record, as they principally involve the question of whether claims pled in a complaint against a party . . . trigger a right to advancement under the terms of a corporate instrument.").

14

The imperative of a provisional, immediate remedy, then, is not so much a matter of court procedure as it is *embedded in the state's substantive law*. I agree that determination of Aleynikov's claim to advancement "cannot wait until the underlying case is over." *Stein*, 452 F. Supp. 2d at 272–73. The advancement question should be resolved early.

Delaware's strong statutory policy in favor of immediate advancement of fees has an interpretive dimension. It dictates that the By-Laws be read liberally in favor of indemnification and advancement. *DeLucca*, 2006 WL 224058 at *7 (holding that, where reasonable, indemnification contracts should be read in favor of indemnification in light of Delaware's pro-indemnification policies); *Delphi Easter Partners Ltd. P'ship v. Spectacular Partners, Inc.*, 1993 WL 328079 at *2, Del. J. Corp. L. 722, 726 (Del. Ch. Aug. 6, 1993) (holding that courts should construe limited partnership agreements "so as to achieve where possible the beneficial purposes that indemnification can afford"). I will therefore read By-Laws § 6.4[3] as broadly as I reasonably can.

B. Parol evidence that has emerged from discovery.

The parties have completed the limited, expedited discovery ordered by Magistrate Judge Hammer. Their renewed submissions essentially point to three major categories of parol evidence that may bear on the "officer" question: (a) GSCo's appointment procedure; (b) GSCo's track record of indemnifying personnel; and (c) the effect of title inflation on the meaning of "vice president." Before considering how this evidence fits into the substantive law, I will discuss its significance from the point of view of the summary judgment standard.

*1. GSCo's appointment procedure*

By-Laws Section 6.4 [1] and [2] clearly specify an appointment procedure by which "officers" of parent and subsidiary corporations may be identified. To simplify slightly, such an appointment must be pursuant to the authority granted by the By-Laws of the corporate entity. Indeed, Section 6.4[1] explicitly incorporates By-Laws Section 4.1, which sets forth the appointment procedure for the Goldman parent corporation.[10] By contrast, By-Laws Section 6.4[3], the category relevant here, eschews any such rule of recognition. It does not

---

[10]   By-Laws Section 4.1 provides that "the Board of Directors ... may elect (i) one or more Chairmen of the Board and/or one or more Vice Chairmen of the Board from among its members, (ii) one or more Chief Executive Officers, one or more Presidents and/or one or more Chief Operating Officers, (iii) one or more Vice Presidents, one or more Treasurers and/or one or more Secretaries ...."

specify, even generically, any appointment procedure by which an "officer" entitled to indemnification may be recognized.

Goldman attempts to fill in that gap with evidence of established practices of GSCo. Initially, Goldman relied on the affidavit of Matthew Tropp, managing director and an Associate General Counsel of GSCo. Tropp stated that GSCo has a practice of appointing its officers only by "formal resolution," and noted that there is no such resolution appointing Aleynikov. Def. Opp. & MSJ at 14. In support, Tropp pointed to GSCo's Partnership Agreement; that Agreement, however, contains neither a definition of "officer" nor a procedure for appointing officers. I noted that "before accepting the generalities in Mr. Tropp's affidavit, a fact finder would want to see some of those underlying facts, which are in Defendant's control." Dec. Op. at 13-15.

In discovery, Goldman produced eleven "Written Consents of the General Partner of Goldman, Sachs & Co" which named or removed officers of GSCo. *See* Marino Cert. Ex. 12; Salimbene Decl. Ex. 9. All of those resolutions are designated as "confidential." In addition, Goldman's Response to Interrogatory No. 3 lists seventeen individuals "who have been appointed officers of GSCo pursuant to its resolution process and have served in that capacity at any time from 2007 through the date of [the Interrogatory]." *See* Marino Cert. Ex. 18.

Goldman does not, however, point to any document wherein this procedure—appointment by resolution—is established or memorialized. Nor does Goldman explain how a reader of By-Laws Section 6.4 would know that, for a non-corporate subsidiary, specifically a New York limited liability partnership, an "officer" is, and *only* is, an individual who has been appointed by written resolution of the general partner. Goldman makes no apologies for this:

> The uncontradicted testimony of Mr. Palm and of Matthew Tropp, the house lawyer responsible for governance issues at GSCo and affiliated domestic entities, establishes that this procedure has invariably been followed in the few instances when it has appointed officers. Their uncontradicted testimony further establishes that such formal, written resolutions of the General Partner are the sole process by which GSCo appoints officers. . . . That the process has not been reduced to writing is unremarkable despite Aleynikov's suggestion that it is therefore contrived; it is rarely used and well-understood by the discrete group within the legal department which has implemented it over time: "in overseeing the process of appointing officers, it happened so infrequently, and we understood that the process by which officers were appointed, that there was no need to take the extra step and

16

memorialize in writing something that was easily handled." Tropp 30(b)(6) Dep. 69:2-23; *see also* Palm Dep. 222:20-225:16, 226:25-228:14.

ECF 145 ("Def. Renewed Opp. & MSJ Brief"), at 6-7.

Goldman also maintains that the persons occupying these appointive positions (if not the appointment procedure itself) are identified publicly in filings with the SEC and FINRA. *Id.* at 8; *see* Salimbene Decl. Ex. 9. That circumstance, however, tends to suggest that many of these appointments have a regulatory purpose. (For example, most are risk or compliance officers.) It does not shed light specifically on the issue of whom should be considered an officer for purposes of the indemnification By-Law.

Goldman thus proffers evidence of a practice, not a policy, with its roots apparently in regulatory, but anyway not indemnificatory, concerns. This evidence does not solve the *definitional* issue: the meaning of the term "officer" in Section 6.4 [3] of the By-Laws. Nothing in any document before me says that non-corporate "officers" for purposes of indemnification (or any other purpose) are limited to individuals designated by written consent. No one could discern from reading any generally promulgated document that the seventeen individuals listed in Interrogatory No. 3, *see* Marino Cert. Ex. 18, are the only individuals that meet the definition in Section 6.4 [3] of the By-Laws. Nor did Goldman ever promulgate in advance even a rough rule of recognition to the effect that the written-consent process is the means by which officers may be distinguished from non-officers.

On summary judgment I cannot find, as Aleynikov urges, that GSCo's appointment process was "contrived" as a *post hoc* justification for denying him indemnification. But GSCo's appointment by written consent of a small number of officers, even taken at face value, takes us only so far.

For one thing, GSCo acknowledges—indeed, positively revels in—a certain disconnect between its operating documents and its practices. Goldman here and in related contexts, *see* section III.B.2, *infra*, indicates that it operates at its own discretion, without resort to any specific authority granted by the By-Laws or the constitutive documents of the partnership. As a result, Goldman does not even contend that the real-life appointment process is prescribed by, *e.g.*, the By-Laws or Partnership Agreement. That circumstance suggests to me that praxis may have little to say about what was intended by Section 6.4[3] of the By-Laws.

17

Goldman's practice-based approach also gives rise to certain anomalies. Thus, for example, Goldman contends that GSCo, as a New York limited liability partnership, "is not required to have *any* officers as a governance matter." Def. Renewed Opp. & MSJ Brief at 5 (citing Palm Dep.). By Goldman's reasoning, there might be *no* person at GSCo who would be entitled to advancement and indemnification.[11] But the parties broadly agree that Section 6.4 [3] is intended as a "catchall," extending the scope of the By-Laws to "cover a range of domestic and foreign entities that are not structured as corporations." *See* Dec. Op. at 12. And everyone similarly agrees that there is a policy in favor of indemnification. That inclusive mandate seems inconsistent with an approach that would deny indemnification and advancement altogether in a form of business organization commonly used within the Goldman organization and elsewhere.

Similarly, Goldman cites what amounts to an unwritten rule that "even employees with the functional title of managing director, senior to vice president, are not considered GSCo officers unless appointed to an officer's position by means of GSCo's resolution process." *See* Def. Renewed Opp. & MSJ Brief at 8 (citing Palm Dep.). That position seems to pull against the plain language of By-Law Section 6.4[3], which extends to "the *manager* of such entity." Moreover, it seems to read the limiting language of By-Laws Section 6.4[1] and [2] into Section 6.4[3], which everyone agrees is distinct. Sections 6.4[1] and [2] explicitly identify an appointment procedure by which an officer may be recognized; Section 6.4[3] makes no attempt to do so, even generically.

None of this is to suggest that Goldman is exceeding its authority, or that the By-Laws mandate some other procedure for the appointment of "officers" in the partnership context. What is clear is that Goldman reserves for itself a broad range of discretion, parallel and unrelated to what is prescribed by the By-Laws. It follows that Goldman's practices cannot be relied on as an expression of what Section 6.4[3] of the By-Laws means; Goldman impliedly acknowledges that its practices do not rest on the authority of that By-Law. The upside of such a freewheeling management style is flexibility; the downside, however, is that procedural categories can become blurred.

So it may be that GSCo is free to designate anyone it wishes as an "officer" according to procedures known only to a "discrete group within the

---

[11]    Of course, an employee might still argue that he or she served "in a similar capacity" to that of an officer, but if "officer" is not defined, and there are no officers, it might be hard to identify the relevant comparison.

Legal Department." But in doing so, GSCo does not define, or alter, the meaning of Section 6.4 of the By-Laws.

In passing, I note also that this unknown, nonpublic appointment policy is potentially inequitable to employees, who have only the By-Laws to go by in determining whether they are eligible for indemnification, advancement, or perhaps other privileges of employment. That concern is heightened where, as discussed below, the firm's course of conduct would lead a reasonable observer to conclude that a wide range of employees, not just a few higher-ups, are entitled to advancement and indemnification.

My point here, however, is that GSCo's appointment procedure has little to say about the interpretive issue before the Court, and does not in itself suffice to create a material, triable issue of fact.

### 2. GSCo's track record of indemnification and advancement

In the last six years, Goldman has paid the legal fees of 51 of the 53 persons at GSCo who incurred (and, presumably, sought) such fees. Of these, 15 held the title of "vice president" of GSCo. From this, Aleynikov draws the lesson that his title of "vice president" entitles him to be considered an "officer" who is entitled to indemnification or advancement of fees. Not so, says Goldman. In all cases but one it paid the legal fees because it wanted to, not because it had to; this was a matter of business discretion, not of entitlement under By-Laws Section 6.4. Def. Renewed Opp. & MSJ Brief at 12–15.

In my December Opinion, I reasoned that Goldman's "permissive indemnification"[12] of persons whom it did not recognize as officers "could be viewed as favorable evidence for GS Group, but it could also be viewed as 'spin' – an attempt to explain away past indemnity decisions that are inconsistent with GS Group's interpretation of the By-laws here." Dec. Op. at 15. I wrote that a "finder of fact would want to test" that issue. *Id.* at 15–16.[13]

---

[12]  GS Group first submitted that, in some cases, it had chosen to indemnify employees who were not officers as a matter of "permissive indemnification." *See* Def. Opp. & MSJ Brief at 17 and Dec. Op. at 15. Defendant later back-pedaled, declaring that when it chooses to indemnify a non-officer employee, or even an officer, it does so as matter of "business discretion." Goldman no doubt has its reasons for choosing one form of terminology over the other. For purposes of my analysis here, however, the terminology makes no difference.

[13]  Counsel for Aleynikov have gotten miles of traction out of my use of the word "spin," implying that I embraced that characterization or predicted that it would be borne out by discovery. To be clear (and I think I was), I identified "spin" as one of two

Discovery has supplemented the record. Over a six-year period, some 53 persons associated with GSCo were considered for advancement or indemnification of legal fees. Of these 53, Goldman paid the fees of 51. And of those 51, 15 were GSCo vice presidents. *See* Marino Cert., Ex. 15 (March 21, 2013 Letter from Ross Pearlson). Aside from Aleynikov, Goldman has denied advancement or indemnification to only one person who sought it. That person, it is true, was a GSCo vice president. *See* n.14, *infra*. But, as noted, Goldman granted advancement or indemnification to 15 other GSCo vice presidents. And Goldman has never cited a person's status as vice president as a reason for refusing advancement or indemnification.

On its face, this would constitute persuasive evidence that a vice president is an officer entitled to advancement or indemnification under the By-Laws. "Persuasive," of course, is not "conclusive." On summary judgment, the court is not to weigh the evidence or make factual findings, but must determine the nature and extent of any material *conflict* in the evidence.

Goldman suggests that there is a material issue of fact because its payment of legal fees in all cases was discretionary. According to Goldman, it acted in the best interest of the firm, without reference to Section 6.4 of the By-Laws, and its acts therefore cannot be taken as evidence that Section 6.4 would have required such indemnification. In only one case, that of Rajat Gupta, does Goldman admit that it advanced legal fees pursuant to its obligation under the By-Laws.[14]

---

contrary possibilities that, in the absence of evidence, could *not* be assumed and would have to be explored through the discovery process.

[14]     *See* ECF 131 ("Pl. Renewed MSJ Brief") at 23-25; Def. Renewed Opp. & MSJ Brief at 12-15. Rajat Gupta was a Goldman Sachs board member who was convicted of conspiracy and securities fraud and sentenced to two years' imprisonment. According to a New York Times article, which does not clearly identify a source for the information, "The cost of Mr. Gupta's legal defense, which has thus far exceeded more than $30 million . . . has been paid for by Goldman because the bank's bylaws require it to pay the legal fees of its top officers and directors. But under a deal reached before his trial, Mr. Gupta agreed that if he was found guilty of insider trading, he would reimburse the bank for the legal fees advanced to him. Goldman must continue to pay his bills until the resolution of his appeal." *See* http://dealbook.nytimes.com/2013/02/25/rajat-gupta-ordered-to-reimburse-goldman-sachs-6-2-million/?_r=0.
  The single example of a refusal to pay fees was that of GSCo vice president [**REDACTED**]. Asked to explain the disparate treatment of [**REDACTED**] and others,

Voluntary or mandatory? It is possible that nearly every GSCo employee whose legal fees were "permissively" paid by Goldman had a colorable claim of right under Section 6.4 of the By-Laws. According to the list furnished by Goldman, three are corporate officers of GS Group, clearly eligible pursuant to Section 6.4[1] and Section 4.1 of the By-Laws. Many of the rest hold the title of "Managing Director" of GSCo. A "managing director" would have at least a colorable claim to be an officer or a "person serving ... as the *manager*" of GSCo. And, as noted above, some fifteen of those who received advancement or indemnification were, like Aleynikov, vice presidents of GSCo.

Lloyd Blankein, Chairman and Chief Executive Officer of GS Group, is an "officer" by any definition. Goldman, however, now attributes its payment of Blankfein's legal fees to its discretion, not to its indisputable obligation under the By-Laws. Goldman advanced the legal fees of GSCo vice presidents Fabrice Tourre, who was sued by the SEC, and Neil Morrison, who was the subject of administrative proceedings based on his alleged involvement in a Massachusetts pay-to-play scheme. Here again, however, Goldman claims that it did so only as a matter of business discretion, "in the best interest of the firm." When asked to further explain its decision, Goldman invoked attorney-client privilege.

The trouble is that, except as to Gupta, Goldman made no contemporaneous statement of the basis for any of these indemnification or advancement decisions. Goldman says it paid the legal fees of 51 individuals at GSCo, not because they were officers (though some of them were), and not because they were entitled to advancement and indemnification (though some of them were), but because Goldman wished to do so. Thus Goldman characterizes even the most clearly mandatory indemnifications as discretionary. And it assigns them this discretionary status only now, after the fact, without any contemporaneous evidence. In some cases, it invokes attorney-client privilege, walling off its decisions from the fact-finding process.

---

Goldman invoked the attorney-client privilege. At oral argument, Goldman's counsel implied that the **[REDACTED]** refusal constituted evidence that vice presidents are ineligible under the By-Laws. The emails that document the **[REDACTED]** request and denial, however, do not contain any reference to the By-Laws. *See* Salimbene Decl., Exs. 17-18. True, one email does state that **[REDACTED]** was "not *entitled* to indemnification or advancement" (emphasis added). But no reference was made to **[REDACTED]**'s title of vice president specifically, or to the By-Laws generally, in this connection.

I am in search of a "genuine" issue of fact, *i.e.,* one for which the evidence is in conflict. In opposition to certain historical facts, all I have is Goldman's *post hoc* characterization: a convenient classification that does not even truly rule out the alternative, but uneasily coexists with it. The authority for a business organization's action is not a fixed and provable historical occurrence, like a car going through a red light; its reality is legal and executory, depending for its existence on a contemporaneous declaration and the organizing documents of that entity. Then, when it made indemnification decisions, Goldman presumably had the power to eschew the By-Laws and invoke its discretion; now, its freedom to retroactively classify its acts as discretionary is more limited. Then, Goldman's statement that an act was discretionary might have been enough to make it so; now, not so much. For this reason, I am inclined to think that this alleged conflict in the evidence is not enough to raise a triable issue.

In the alternative, however, there is a view that does not require me to go so far. Assume *arguendo* that, on summary judgment, I cannot definitively say whether Goldman's many indemnification decisions were truly and solely discretionary. Even so, Goldman's position implies, at best (best from Goldman's point of view, that is) that the indemnification history is *irrelevant* to the interpretation of the By-Laws. In Goldman's account, its indemnification decisions and the By-Laws occupy separate worlds. If I draw all inferences in favor of Goldman's "discretionary" rationale, it still tells us nothing about who is or is not an officer of GSCo for purposes of By-Laws Section 6.4. That in many ways leaves us where we started, with a definitional or semantic issue.

### 3. *Title Inflation*

Aleynikov argues that, as a "vice president," he is an officer under the "plain and commonly-understood meaning" of the term. Goldman replies that Aleynikov's job designation reflects title inflation in the financial services industry. "Vice president is merely a functional title, because it connotes a level of seniority between associate and managing director, and as distinguished from an officer title, which is somebody who has been appointed through the process." *See* Marino Cert, Ex. 8 ("Tropp Dep.") at 248:16–23). The title of vice president, says Goldman, is held by "thousands at the firm and across the financial services industry.'" Def. Renewed Opp. & MSJ Brief at 1, 24-27. According to Goldman, the indemnification provision of the By-laws could not

have been intended to cover so many.[15]

That alleged title inflation, assuming (as I must) that it exists, may not have the significance that Goldman ascribes to it. For one thing, Goldman's bounteous assignment of the title of vice president is not alleged to be confined to partnerships and other non-corporate entities. Rather, it is alleged to be a universal characteristic of the financial services industry, an industry that does much of its business in corporate form. For example, GS Group (*i.e.*, Goldman Sachs Group, Inc.), is a corporation, as are at least some of its subsidiaries. There seems to be no dispute that *corporate* vice presidents—however many there may be—are covered by Section 6.4. So even taking Goldman's account at face value, it cannot be just the sheer number of vice presidents, or the industry's over-exuberance in bestowing the title, that bars Aleynikov's position from consideration.

It may be the case that Goldman (or the industry of which it is a part) has been profligate in conferring the title of vice president. If so, Goldman must bear the consequences of that profligacy. Goldman might easily have chosen to be more sparing with job titles, or to confer them in some other way. It might easily have drafted its By-Laws to restrict indemnification to a well-defined class. It did not.

I observe in passing that the folkways of the financial services industry are not necessarily determinative here. I also consider it likely that the average person in the street would consider a vice president to be an officer. At this procedural stage, I will not resolve such issues factually. But here, as in sections III.B.1 & 2, above, I must determine whether this issue is a genuine, material one that stands in the way of summary judgment on advancement. For the reasons expressed here, and below, I do not believe that it is.

---

[15]   Goldman contends that Aleynikov's claim that he believed he was an officer is not credible because he did not seek to invoke the By-Laws until three years after he was arrested. *See* Marino Cert, Exh. 9 *("Aleynikov Dep.")* at 94:395:2 ("This goes to show that the idea that he's an officer is an after-the-fact creation by him"). In addition, Aleynikov admits that, before his arrest, he never read the By-Laws or considered his right to advancement and indemnification, *id.* 96:6–97:14. I do not find these facts to be material. Aleynikov's possession of rights does not necessarily depend on his prior awareness of them. *See* Bylaws § 6.4 (person is "presumed to have relied" on By-Law by virtue of having served in a covered position); *see also* Section III.C.2, *infra.*

C. <u>Summary Judgment: Advancement</u>

I have considered and sifted some of the parol evidence bearing on the definition of "officer." I now proceed to the nub of the issue: whether any genuine, material issue of fact precludes judgment in favor of Aleynikov as a matter of law. I focus here on advancement, rather than indemnification. In light of the foregoing discussion, I interpret the definition of "officer" in the By-Laws broadly. I then discuss the Delaware version of the doctrine of *contra proferentem*, pursuant to which a business entity's organizing documents, *even if ambiguous*, may be construed against the drafter in the context of summary judgment. Finally, I discuss the less controversial elements of the advancement claim, the scope of the remedy, and the disposition of remaining claims.

### 1. *The role of ambiguity*

By-Laws are interpreted in accordance with "the rules used to interpret statutes, contracts, and other written instruments." *See Gentile v. Singlepoint Fin., Inc.,* 788 A.2d 111, 113 (Del. 2001) (interpretation of by-law regarding mandatory advancement of fees); *Centaur Partners IV v. National Intergroup, Inc.,* 582 A.2d 923, 928 (Del. 1990) ("general rules of contract interpretation" apply to corporate charters and by-laws). Perhaps that is nowhere more true than where, as here, the bylaws touch on the mutual rights and responsibilities of employers and employees.

Those ordinary rules of contract interpretation are well known. Perhaps less well known, however, is the manner in which Delaware applies them in the context of a business's bylaws or organizational agreements:

> In general terms, corporate instruments such as charters and bylaws are interpreted in the same manner as other contracts. Absent ambiguity, their meaning is determined solely by reference to their language. To demonstrate ambiguity, a party must show that the instruments in question can be reasonably read to have two or more meanings. And "[m]erely because the thoughts of party litigants may differ relating to the meaning of stated language does not in itself establish in a legal sense that the language is ambiguous."

> Ordinarily, when corporate instruments are ambiguous, the court must consider the relevant extrinsic evidence in aid of identifying which of the reasonable readings was intended by the parties. There are situations, however, when this general rule is

> inapplicable. For example, when a court is asked to construe a limited partnership agreement drafted solely by the corporate general partner, it will resolve all ambiguities against the general partner as drafter and in favor of the reasonable expectations of the public investors.

*Harrah's Entertainment, Inc. v. JCC Holding Co.,* 802 A.2d 294, 309–10 (Del. Ch. 2002) (footnoted case citations omitted). (The final sentence relates to the doctrine of *contra proferentem,* discussed in the next section.)

Under those rules, the plain and ordinary meaning of "vice president" is, of course, the starting point and touchstone of the analysis. My first task is to determine whether the language of this By-Law is plain, or whether it is ambiguous—even though, as noted, the law provides that some ambiguity would not in itself be fatal.

Aleynikov testified at his deposition that he believed himself to be an officer and reasonably relied on the common meaning of his title. *See* Deposition of Sergey Aleynikov, Marino Cert., Ex. 9 (Aleynikov Dep.) at 37:5–18 ("it's common knowledge that vice presidents are officers."); 38:4–22 ("I received an offer letter that stated that I was vice president so I assumed that was an officer position.").

It is uncontroversial that a "vice president," at least in the corporate context, is a kind of officer. *See* Black's Law Dictionary 1702 (9th ed. 2009) ("vice president … (2) A corporate *officer* of mid-level to high rank, usu. having charge of a department") (emphasis added); Webster's New Universal Unabridged Dictionary 2036 (2d ed. 1983) ("vice president … (3) in some corporations, any of several *officers,* each in charge of a separate department") (emphasis added). The title of vice president has some accepted meaning in a corporation. By-Laws Section 6.4, however, has effectively transplanted that title, without further explanation or elaboration, to this LLP.

There are a few cases that discuss the plain meaning of "vice president," albeit in contexts far removed from that of this case. For example, in *Brakke v. Idaho Dep't of Corr.,* No. 1:11-cv-00455 (LMB), 2012 WL 4409905 (D. Idaho Sept. 25, 2012), a defendant, Corizon, Inc., contended that process had not been served on a corporate "officer," as required by Fed. R. Civ. P. 4(d)(3). Dolan, the person who received the complaint, stated that "while he is a vice president, he is 'not an officer of Corizon, Inc., nor [is he] a managing or general agent.'" The court demurred, reasoning that the "title 'Regional Vice

President' connotes an officer role to a normal observer," and held that Dolan was an "officer" able to accept service.

In *Ter Bush & Powell, Inc. v. State Tax Comm'n*, 58 A.D.2d 691, 395 N.Y.S.2d 762, 763–64 (3d Dep't 1977), the court interpreted a franchise tax statute that applied to salary and compensation paid to "elected or appointed officers." The taxpayer company sought to exempt "compensation paid to eight individuals having the title of vice-president or senior vice-president." The company claimed that these were "honorary" titles, given to salespeople who lacked any real executive authority. The court held that the statute's reference to "officers" was unambiguous, and that it could not be "read so as to include an implied exemption for compensation paid to individuals who hold the titles of executive positions but arguably do not fulfill the functions thereof. Taxpayer chose to elect certain individuals as officers, and it must be construed to have known that this would subject such individuals' compensation to inclusion in computation of the franchise tax." Goldman, too, chose to award the title of vice president for good and valid business reasons. *Ter Bush* implies that, Goldman must abide by the implications of that decision.[16]

The usual and ordinary meaning of vice president, supplemented by this case law, makes out a fair case that the By-Law here is unambiguous. Even resolving every material factual issue in favor of Goldman, I find that the By-Law may be enforced as written, as a matter of law, and that advancement of fees should be awarded. I am emboldened in that analysis by my belief that the policy of the statute dictates a broad and liberal construction of indemnification and, especially, advancement under the By-Laws. (*See* Section III.A, above.)

---

[16]    As I pointed out in my December 2012 opinion, most of the other cases cited by Aleynikov are unhelpful, because they relied on factors in addition to the title of "vice president." *See, e.g. In re Foothills Texas, Inc.*, 408 B.R. 573 (Bankr. D. Del. 2009) (fact that employees of Chapter 11 debtor held title of "vice president" did not determine whether they were "officers" for purpose of bankruptcy statute limiting retention payments to insiders); *Roller Bearing Indus., Inc. v. Paul* , 3:05-CV-508-S, 2010 WL 1257715, *2 (W.D. Ky. Mar. 26, 2010) ( "[w]hile a title might not be enough on its own to justify finding an employee to be an officer of a company," annual reports in which individual was labeled "Vice President and identified as an officer" were a sufficient basis); *EMC Corp. v. Allen*, 975972B, 1997 WL 1366836, *1, *3 (Mass. Super. Dec. 15, 1997) (former vice president who "[t]hroughout his employment at EMC . . . worked in senior marketing positions . . . had access to confidential proprietary information [and] was compensated over $1 million dollars in salary, bonuses and stock options" was likely an "officer" within the meaning of a non-compete agreement).

That might well end the matter, because the public policy in favor of advancement counsels against consideration of parol evidence, even when the language is somewhat unclear:

> *Although advancement provisions in corporate instruments often are of less than ideal clarity, rarely is resort to parol evidence appropriate or even helpful,* as corporate instruments addressing advancement rights are often crafted without the involvement of the parties who later seek advancement and often with little negotiation between any contending parties at all. Those factors are not problematic, however, as they tend to reinforce the legal policy of this State, which strongly emphasizes contractual text as the overridingly important guide to contractual interpretation.

*DeLucca,* 2006 WL 224058 at *6 (emphasis added). In other words, the policy animating the Delaware statute is that, where advancement is concerned, some contractual ambiguity will be tolerated.

Nevertheless, I briefly consider the parol evidence discussed more fully above. GSCo's appointment procedure, even if I grant Goldman's assertions the status of fact, does not assist us in the interpretation of By-Laws Section 6.4[3]. Goldman reserves to itself a wide range of discretionary procedures, untethered to the particulars of this By-Law. (*See* Section III.B.1, *supra*.) GSCo's history of indemnifying or advancing fees to a broad range of vice presidents and others is in Aleynikov's favor. That evidence is nominally, but not materially, contradicted; Goldman offers only a *post hoc* characterization of its decisions as discretionary, rather than mandatory under the By-Laws. But having failed to produce any contemporaneous evidence of that, Goldman cannot invoke corporate procedures against Aleynikov; to do that, a party must have turned square corners itself. Setting that aside, this evidence would be at best neutral; even Goldman's interpretation of the facts implies that these indemnification decisions have no bearing on the interpretation of the By-Law in question. (*See* Section III.B.2, *supra*.) Finally, Goldman attempts to rebut the plain implications of the title vice president by referring to title inflation in its industry. One trouble with this argument is that it applies just as strongly to corporate vice presidents, who indisputably are covered. Another is that the decision of whom to designate as vice president and how specifically to restrict the class of persons eligible for indemnification is entirely within Goldman's, not Aleynikov's, control. (*See* Section III.B.3, *supra*.)

Given Delaware's liberal interpretive principles with respect to advancement, *see DeLucca v. KKAT Mgmt., supra,* I do not believe that this parol evidence is sufficient to raise a material issue of fact. On that basis alone,

I would award advancement. At any rate, even if there were an issue of fact, it would cease to be a material one in light of the Delaware doctrine of *contra proferentem*, discussed below.

### 2. *The special status of* contra proferentem *with respect to bylaws*

I will indulge Goldman's position one step farther. Having assumed *arguendo* that the parol evidence should be considered, I will further assume that the term "officer" carries with it some ambiguity as applied to the vice president of an LLP. Nevertheless, Delaware substantive law establishes that an ambiguity in an advancement provision does not give rise to a material issue of fact when the ambiguity was introduced by the corporate drafter.

I pause for an observation. Even in cases of ordinary ambiguity, I do not believe the letter or spirit of the Delaware statute permits the Court to take the easy option of simply denying the motion and leaving the parties to prepare the matter for trial some months, or years, in the future. As to advancement of fees, it is now or never. If there is no basis for a decision now, so be it, but if there is a valid way to decide the issue now, it should be decided. *See* Section III.A, *supra; DeLucca v. KKAT Mgmt., supra.*

One valid avenue to such a decision is the Delaware doctrine of *contra proferentem*. The purpose of a written contract is to express a bargain between two parties so each knows what to expect prospectively. But if the terms of the contract fall short of that goal—if they are ambiguous—the burden of that ambiguity should fall on a party who was solely responsible for the drafting of the contract. That is the principle of *contra proferentem*—that "ambiguous terms should be construed against their drafter." *Stockman v. Heartland Indus. Partners, L.P.*, CIV.A. 4227-VCS, 2009 WL 2096213, *5 (Del. Ch. July 14, 2009); *see also Twin City Fire Ins. Co., v. Delaware Racing Assoc'n*, 840 A.2d 624, 630 (Del. 2003) (discussion of the doctrine).

Under Delaware law, the doctrine of *contra proferentem* has particular force with respect to the governing or constitutive documents of a business organization. Almost by definition, a person who joins such an organization will not have had the opportunity to negotiate the terms of such documents. "[W]here the contract in dispute is an entity's organizing document, like the Partnership Agreement, *a dispositive order following motion practice may be appropriate even where the contract is ambiguous*." *Stockman*, 2009 WL 2096213 at *5 (emphasis added; interpreting an indemnification and advancement provision in a partnership agreement).

> When an agreement . . . makes promises to parties who did not participate in negotiating the agreement, Delaware courts apply the general principle of *contra proferentem*, which holds that ambiguous terms should be construed against their drafter. The *contra proferentem* approach protects the reasonable expectations of people who join a partnership or other entity after it was formed and must rely on the face of the operating agreement to understand their rights and obligations when making the decision to join.

*Id. See also SI Mgmt. L.P. v. Wininger*, 707 A.2d 37, 43 (Del. 1998)("[A]mbiguous terms in the Agreement should be construed against the General Partner as the entity solely responsible for the articulation of those terms."); *cf. Penn Mut. Life Ins. Co. v. Oglesby*, 695 A.2d 1146, 1149–50 (Del.1997) ("[I]t is the obligation of the issuer of securities to make the terms of the operative document understandable to a reasonable investor whose rights are affected by the document."). In this peculiar context, then, Delaware law not only tolerates some ambiguity, but resolves it against the business entity whose organizing documents are at issue.

The Delaware courts, moreover, apply the *contra proferentem* doctrine in a variety of contexts, including that of a dispositive motion. *See, e.g., Stockman, supra*; *Werner v. Miller Tech. Mgmt., L.P.*, 831 A.2d 318, 333 (Del. Ch. 2003) (applying *contra proferentem* to partnership agreement in the course of denying motion to dismiss); *In re Nantucket Island Assocs. Ltd. P'ship Unitholders Litig.*, 810 A.2d 351, 361 (Del. Ch. 2002) (construing ambiguous limited partnership agreement against the general partner who drafted it, granting plaintiffs' motion for summary judgment and denying cross-motion); *see also Harrah's Entertainment, Inc.*, , 802 A.2d at 309–10 (Del. Ch. 2002) (applying principle by analogy in corporate charter context in post-trial opinion).[17] This is not to suggest that Delaware's procedural law supplants federal summary judgment procedures in federal court. Rather, under Delaware's *substantive* contract law, certain factual issues proffered by the defendant/drafter are not deemed "material" to the court's decision.[18]

---

[17]   Delaware's robust application of *contra proferentem* in this context highlights the extent to which the Court has indulged Goldman's position. I have considered the parol evidence in the interest of thoroughness; it is far from clear, however, that the Court is required to do so. Delaware law makes an exception to the usual rule that extrinsic evidence will be considered to resolve an ambiguity. As discussed above, corporate instruments, unlike negotiated contracts, will be construed against the corporation. *Harrah's Entertainment, Inc.*, 802 A.2d at 309-10.

[18]   In any event, Delaware's summary judgment standard is identical to that of the

Thus, in *Stockman, supra,* the court granted summary judgment on a claim for advancement of fees. It held that "any ambiguities in Heartland's Partnership Agreement should be resolved in favor of the reasonable expectations of Heartland's Indemnitees regarding their indemnification and advancement rights." 2009 WL 2096213 at *5.

Goldman responds that Aleynikov, when he came to work, did not really have any "expectation" with respect to Section 6.4 of the By-Laws; indeed, he never read the By-Laws until he sought advancement and indemnification some years later. *See* Marino Cert, Ex. 9 (Aleynikov Dep.) at 94:3–95:2. But the By-Laws themselves provide that a person will be "presumed to have relied" on them by virtue of having served in a covered position. *See* Bylaws § 6.4. More broadly, Aleynikov's may possess a right despite his prior unawareness of it. Were it not so, each employee would have different rights, commensurate with his or her diligence in reading the corporate fine print. By their nature, constitutive documents such as bylaws and partnership agreements are meant to structure the affairs of everyone associated with a business entity:

> As a practical matter, it is critical that the governing instruments of entities be interpreted consistently and that they be applied in a predictable manner. To introduce the consideration of parol evidence when issues regarding subjects like indemnification come up would create unpredictable results, reduce the incentives for clear drafting, and undermine the ability of investors, officers, and other relevant constituencies to rely on the written text of governing instruments in deciding whether to invest in, work for, or supply debt capital to entities. Thus, *where an entity's governing instruments are involved, the onus is on the drafter to be clear.*"

*Stockman,* 2009 WL 2096213 at *5 (emphasis added). Goldman cannot escape from its burden as drafter by recourse to Aleynikov's ignorance of his rights. Whether or not Aleynikov actually read and relied on the By-Laws—and

---

Federal Rules. The movant must demonstrate "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Del. Ct. Ch. R. 56(c).

Aleynikov initially sought a preliminary injunction, and in the alternative urged the Court to approach this case as a "summary advancement proceeding" in the Delaware Court of Chancery, *see* Pl. App. & MSJ at 9-10; *see Confederate Motors,* 859 F. Supp. 2d at 184, 188 (internal quotations and citations omitted); *Kaung v. Cole Nat'l Corp.,* 884 A.2d 500, 509 (Del. 2005). I held that I could not, consistent with the doctrine of *Erie R. Co. v. Tompkins,* 304 U.S. 64 (1938), conduct a state summary proceeding within a federal action. *See* Dec. Op. at 23. The point here is different; Delaware cannot dictate federal summary judgment procedure, but its substantive contract law, in this diversity case, may dictate whether an issue is material.

realistically, how many employees do?—he was *entitled* to rely on the rights granted by the By-Laws.[19]

For this additional reason, I construe By-Laws Section 6.4[3] against its corporate drafter, Goldman, and I hold that the term "officer" encompasses Aleynikov's position as a vice president of GSCo.

### 3.  *Remaining elements of a claim for advancement*

I deal more briefly with the remaining, less controversial elements of Aleynikov's claim for advancement of fees and expenses.

As I have found that Aleynikov is an officer pursuant to Section 6.4[3] of the By-Laws, the only remaining question is whether the criminal charges against him were brought "by reason of the fact" that he was an officer of the company. *See* DGCL § 145(e); Salimbene Decl., Ex. 1 (By-Laws) § 6.4. "The phrase 'by reason of' can be equated to 'by virtue of,' 'by force of,' or 'by the authority of' . . . . '[B]y reason of' convey[s] the concept of a causal connection or nexus between . . . the charges alleged in the criminal proceedings and the corporate function or official corporate capacity of the [individual charged]." *Perconti v. Thornton Oil Corp.*, CIV. A. 18630-NC, 2002 WL 982419, at *4 (Del. Ch. May 3, 2002). *See also Homestore, Inc.*, 888 A.2d at 214 ("if there is a nexus or causal connection between any of the underlying proceedings contemplated by section 145(e) and one's official corporate capacity, those proceedings are 'by reason of the fact' that one was a corporate officer, without regard to one's motivation for engaging in that conduct.").

Aleynikov submits that "the State Action against Aleynikov clearly arose from and has a nexus to his position at GSCo: he is alleged to have stolen GSCo computer source code while he was a vice president of the company. . . . the State Action is based on the contention that Aleynikov employed his corporate powers to acquire proprietary source code from GSCo. He therefore did so 'by reason of the fact' that he was an officer of GSCo within the meaning of the By-Laws and the DGCL." Pl. Renewed MSJ Brief at 27-28. I agree. And at any rate, Goldman does not seem to contest that Aleynikov's criminal proceedings arise "by reason of" his position at Goldman.

---

[19]     And if, as Goldman asserts, Aleynikov's knowledge is critical to establishing their mutual obligations, then Goldman's reliance on an admittedly confidential, unpublicized method of choosing officers becomes still more problematic. *See* Section III.B.1, *supra*.

Goldman may understandably find this result galling; it believes that Aleynikov has stolen its property. If there is any comfort, it may lie in the fact that Goldman has also indemnified and advanced fees in cases where the conduct was alleged to be unlawful and, in the broader sense, no less harmful to Goldman, even if Goldman was not the direct or intended victim.

Based on all of the foregoing, I grant Aleynikov's motion for summary judgment as to liability on the issue of advancement only. Goldman's cross-motion for summary judgment is denied as to the issue of advancement.

Still outstanding are the question of the amount of fees and the calculation of "fees on fees" (*i.e.,* fees and expenses incurred in this action with respect to the claim on which Aleynikov has prevailed). As to these issues, the parties will follow the procedures outlined in the Conclusion of this opinion and the accompanying order.

## D. Summary Judgment: Indemnification and other issues

I do not grant summary judgment as to indemnification. Goldman does not dispute that Aleynikov was "successful" in defending the Federal Action, a prerequisite for indemnification. *See Perconti,* 2002 WL 982419, at *4 ("Section 145(c) assures indemnification to the corporate officer who has been 'successful' in the criminal proceeding. It does not require a determination that the corporate officer was "innocent.""); *Stockman,* 2009 WL 2096213, at *10 (Del. Ch. July 14, 2009) ("An indemnitee in a criminal proceeding is successful any time she avoids conviction: '[s]uccess is vindication ... any result other than conviction must be considered success.'") (quoting *Merritt-Chapman & Scott Corp. v. Wolfson,* 321 A.2d 138, 141 (Del. Super. 1974)).

Nevertheless, the indemnification claim—an ordinary claim for damages based on events already concluded—is not marked by the same urgency that infuses the advancement claim. Further, there is reason to think that the indemnification issues have not been fully fleshed out by the limited discovery that has been granted to date. I also agree with Goldman that any judgment based on the indemnification claim should be held off until Goldman's affirmative defenses and counterclaims have been explored in discovery and decided. (I note that Aleynikov's motion to dismiss those counterclaims is pending.) Goldman correctly points out that it has not yet had significant discovery on certain affirmative defenses, including allegations that Aleynikov has overstated the amount of attorney's fees actually incurred in the Federal Action. In addition, Goldman has filed significant counterclaims for damages,

and these, if established, might substantially offset any indemnification award. It is possible, too, that the State Case might be concluded while this one remains pending; indeed, under one possible scenario, a repayment obligation could arise under Aleynikov's undertaking. Of course we simply do not know at this point; the resolution of all these matters is not yet final.

In short, even if the indemnification claim could now be decided and reduced to an amount certain, I would withhold judgment until all remaining issues have ripened. *A fortiori,* I will do so given the unsettled posture of the claims and the need for further discovery.

## CONCLUSION

Pursuant to Section 6.4[3] of GS Group's By-Laws, Aleynikov is entitled to advancement of legal fees and expenses arising from his defense of the State Action, as well as duly apportioned "fees on fees" in this civil action.

For the reasons stated above, Plaintiff's motion for summary judgment is **GRANTED IN PART** as to advancement only. Defendant is ordered to pay Aleynikov's legal fees and expenses incurred to date in connection with the State Action, and to pay such fees and expenses periodically as they are incurred going forward.

Magistrate Judge Hammer will supervise the payment process, unless it proves too unwieldy, in which case a Special Master may be appointed. The parties are directed to cooperate in order to focus on matters truly in dispute. They are advised that, if a Special Master must be appointed, the Court may order that the parties share the expense as a nonreimbursable cost.

MTB and Aleynikov shall submit copies of their bills and time records in support of periodic applications for fees and expenses. They may do so monthly, bimonthly, quarterly, or at such longer intervals as may seem advisable. Descriptions of services may be reasonably redacted to avoid disclosure of privileged material. Goldman will be given a reasonable period of time, to be set by the Magistrate Judge, to review such submissions and submit any objections.

MTB and Aleynikov may also submit copies of bills and time records to document claims for "fees on fees" in this action. Those materials will be accompanied by a reasonable proposal to determine whatever portions of such fees and expenses are fairly attributable to the issue of advancement. Again, descriptions of services may be reasonably redacted to avoid disclosure of

privileged material. Goldman will be given a reasonable period of time, to be set by the Magistrate Judge, to respond.

As in any fee situation, bills will be scrutinized for reasonableness. The Court expects counsel to confer and reach reasonable accommodations, and it will not indiscriminately award "fees on fees" for the litigation of disputes it deems excessive or unreasonable.

Plaintiff's motion for summary judgment is otherwise **DENIED.** Goldman's cross-motion for summary judgment is **DENIED.** Both of these denials are without prejudice to renewal if and as appropriate when discovery is complete.

An appropriate order follows.

**KEVIN MCNULTY**
**United States District Judge**

Dated: October 16, 2013

34